**Tony T. DEBERRY, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted Oct. 19, 1982.

Decided Jan. 27, 1983.

---

Raymond J. Otlowski, Asst. Public Defender, Wilmington, for appellant.

James B. Ropp, Deputy Atty. Gen., Wilmington, for appellee.

Before QUILLEN, HORSEY and MOORE, JJ.

MOORE, Justice:

The defendant, Tony T. Deberry, challenges his convictions in the Superior Court for first degree rape (11 *Del.C.* § 764), first degree kidnapping (11 *Del.C.* § 783A), and possession of a deadly weapon during the commission of a felony (11 *Del.C.* § 1447). He has been sentenced to life imprisonment.

Deberry first contends that reversible error occurred when the State did not produce or account for potentially exculpatory evidence. We agree and reverse since this deprived Deberry of evidence to which he was entitled under Superior Court Criminal Rule 16(b) and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He also argues that the victim's out-of-court identification should have been suppressed, but in our opinion the identification evidence was properly admitted. Because the kidnapping and weapons charges necessarily depend upon the rape conviction and cannot stand independently of it, we reverse all of the convictions and remand the case for a new trial, subject to certain conditions.

### I.

### A.

The alleged victim, Beverly, and Deberry were both employed by Delaware Park racetrack during the summer of 1980. The State's evidence was that on August 14, 1980, Beverly, her boyfriend, Mark, and Deberry had been attending a party which began about 12:30 or 1:00 p.m. on the track premises. People were drinking all afternoon and taking drugs. As the party went on into the night, Mark became involved in several fights, and on one occasion Deberry helped break up an altercation. Afterwards Deberry invited Beverly and Mark to his room to calm down from these incidents. There, they continued to drink and take drugs. According to Beverly, Deberry tried to persuade her to spend the night with him. Soon after Deberry's proposition, Beverly went to another bunkhouse to sleep with two other men, one of whom Mark had fought earlier. Mark accompanied her but decided to sleep outside because of his earlier fight with one of the occupants.

Beverly claims she was awakened by Deberry shortly after falling asleep. She told him to leave, and he did so. Sometime later she was again awakened by Deberry, who was attempting to pull her pants off. This time Deberry put a knife to Beverly's throat. When she saw the knife, she supposedly grabbed for it and cut several fingers.

Beverly and Deberry then went about one hundred yards from the bunkhouse to a spot behind a barn. He threatened to kill her if she screamed, and he ordered her to undress. After partially undressing, Deberry had intercourse with her. They spent about thirty minutes behind the barn when Deberry began to fear discovery. He ordered Beverly to dress and led her at knife point to a more secluded area outside the track enclosure. To reach this location, they had to pass a guard station, where a guard observed two people leave the track. When they reached the second spot, Deberry made Beverly undress, and for an hour or more they had intercourse.

The two then returned to the track complex. The guard at the gate asked for and examined their employee identification cards. When they separated, Deberry warned Beverly not to mention the incident. Returning to her boyfriend, Beverly woke him to take her to the hospital to have her hand treated (which later required sutures). On the way out of the track complex, she told him that Deberry had raped her. The police were called and arrived about ten minutes later. Beverly explained what happened and led them immediately to Deberry's bunkhouse. An officer went inside and brought Deberry to the door. Beverly was sitting in a police car about 20–30 feet from Deberry, and the car's headlights were aimed toward the door in which Deberry stood. A policeman asked

her if Deberry was the assailant, and she answered without hesitation that he was.

Deberry's version of the facts was that after accompanying Beverly and Mark to the bunkhouse where she wanted to sleep, both Deberry and Mark bedded down outside her door. However, the ground was damp, and after a few minutes he returned to his own bunkhouse where he promptly went to sleep. The next thing he knew was when he was awakened by the police. He has consistently denied any participation in the alleged attack on Beverly.

### B.

In a pre-trial discovery request, the defense asked for the following:

3. A list of all books, papers, documents or tangible objects in the possession of the State pursuant to its investigation of the above-captioned case.

\* \* \* \* \* \*

5. All information and materials in the possession of the State which fall within the scope of *Brady v. Maryland* . . . and its progeny as to the defendant in the above-captioned case.

The State replied that there were no objects in its possession, and that there was no *Brady* material.

Immediately before the start of Deberry's first trial (which resulted in a mistrial), the defense inquired about production of the clothes Deberry wore during the alleged attack. The clothing was of obvious relevance since the likelihood of Beverly's blood being found on it was very strong. She and the defendant purportedly had intercourse in two places for 1½ hours or longer; she claimed to have been cut when Deberry awoke her; and the injury was severe enough to require stitches several hours later. Under such circumstances the defense argued that Deberry could not avoid getting Beverly's blood on his clothes if he in fact was her assailant. Counsel asked the court to determine if the clothing was available, and he indicated that the defendant would seek dismissal of the charges if these items were not produced.

In response to the defense allegation that the presence or absence of blood on Deberry's clothing was material to the case, the prosecutor stated that he was unaware of any blood found on Deberry's clothes. The trial judge observed that if the presence of blood was at issue, testimony that there was no blood on the clothing would be an acceptable substitute for the actual clothing. However, the judge's ultimate ruling went only to the scope of testimony about the injury on Beverly's hand, rather than the potentially exculpatory effect of the absence of blood on Deberry's clothes.[1] The prosecutor was also directed to determine if the clothing was available and to so advise the defense. The clothing, however, was not found.

At the second trial, one state police detective testified, consistent with his testimony at Deberry's first trial, that a detective assigned to the evidence unit took Deberry's clothing and the victim's clothing. The evidence unit detective, however, testified that Deberry's clothing had not been seized and had not been sent to the FBI for analysis. Furthermore, he did not know what had happened to those items. Deberry testified that the police took all of his clothing from his room. He never returned there, having been incarcerated since his arrest. Thus, he

---

1. This appears from the following exchange between the trial judge and the deputy attorney general trying the case:

THE COURT: Well, let me just make this point: That if the clothing is itself not available, the State shouldn't attempt to introduce any testimony that there was blood, unless notice is given to the defendant, and I can hear any further application.

MR. MIECZKOWSKI [Deputy Attorney General]: When you say blood on the clothing—

THE COURT: Yes.

MR. MIECZKOWSKI: I don't think we expect doing that. The only evidence we intend to introduce of the injury would be the victim's treatment and the doctor who examined and treated that injury.

THE COURT: Well, I would ask you—

MR. MIECZKOWSKI: I'll avoid any reference to it.

THE COURT: Yes.

states that the police have had full control over his personal effects since that night.

The forensic evidence introduced at trial consisted of results of blood and hair comparisons. From the victim's jeans, a black head hair of Negroid origin was recovered. Though the majority of structural characteristics resembled those of Deberry's hair, there were sufficient disparities to prevent the FBI analyst from reaching any conclusion as to its origin. In the combings obtained from Deberry's pubic region, a hair was found that was dissimilar to that of the victim, and no other hair was recovered. While there were blood and semen stains on Beverly's clothes, results of blood typing tests were inconclusive. There was no evidence about blood on the knife allegedly used by Deberry in the attack. The doctor who examined the victim testified that there were no signs of forcible intercourse, but the absence of trauma would be consistent with either non-consensual or consensual intercourse.

## II.

### A.

Deberry contends that the State was required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), to produce his clothing for examination. In light of the inconclusive results of the forensic tests, Deberry's clothes, on the basis of possible stains and hairs, could have disputed the victim's story. Furthermore, the absence of stains and hairs on his clothing would have been material to the issue of guilt since the evidence could have created a reasonable doubt not otherwise present.

In response, the State argues that the duty under *Brady* and *Agurs* attaches only when it actually possesses or has access to the requested material. *Boyer v. State,* Del.Supr., 436 A.2d 1118, 1126–27 (1981).

Since the evidence at trial was unclear as to the State's possession of the clothing, so the argument goes, there was no duty to produce it. The State further contends, relying on *Agurs,* 427 U.S. at 106–07, 96 S.Ct. at 2398–2399, that in the context of the defense's general request for *Brady* material, the clothing was not so obviously exculpatory as to trigger the State's duty to disclose it. Finally, according to the State, the absence of blood, semen, or hair on the clothes would not create a reasonable doubt that did not otherwise exist as to Deberry's guilt, and the clothing was therefore immaterial evidence by the standards of *Agurs,* 427 U.S. at 112–13, 96 S.Ct. at 2401–2402.

The parties have argued this case along the lines suggested by *Brady* and *Agurs,* i.e., was the evidence favorable to the defense, and was the evidence material? However, we view the issue differently. The question is not whether the clothing was subject to discovery by the defense, but what should be done when the State takes possession of exculpatory (or potentially exculpatory) evidence and then loses or destroys it before or in response to the defendant's discovery request. Perhaps in a broad sense *Brady, Agurs,* and *Stokes v. State,* Del.Supr., 402 A.2d 376 (1979), which sets forth additional factors to be considered when deciding a *Brady* claim, are relevant here. But those cases beg the question which we face: what relief is appropriate when the State had or should have had the requested evidence, but the evidence does not exist when the defense seeks its production? The State argues that its duty under *Brady* attaches only when the State has possession of or access to the requested items (*Boyer,* 436 A.2d at 1126–27), but we think there is little doubt that the State actually had possession of Deberry's clothing at one time and then lost or destroyed it, thus distinguishing this case from *Boyer.*[2] *Brady* and *Agurs* form a

---

2. The State argued that the detective's recollection about who had custody of the evidence might have been faulty since it was clear that the victim's clothing had been taken by a hospital employee and not by the evidence unit detective. However, the detective's statement that the evidence unit detective took the victim's clothing can also be interpreted to mean

backdrop against which we decide this case, but they are analytically distinct and not strictly applicable to this situation. *E.g., Government of the Virgin Islands v. Testamark,* 570 F.2d 1162 (3d Cir.1978); *United States v. Bryant,* 439 F.2d 642 (D.C.Cir. 1971); *Brown v. United States,* D.C.Ct. App., 372 A.2d 557 (1977).

■ Instead, claims of this type must be examined as follows:

1) would the requested material, if extant in the possession of the State at the time of the defense request, have been subject to disclosure under Criminal Rule 16 or *Brady?* [3]

2) if so, did the government have a duty to preserve the material?

3) if there was a duty to preserve, was the duty breached, and what consequences should flow from a breach?

*Brown,* 372 A.2d at 559. *See also, e.g., United States v. Grammatikos,* 633 F.2d 1013 (2d Cir.1980); *United States v. Loud Hawk,* 628 F.2d 1139 (9th Cir.1979); *United States v. Miranda,* 526 F.2d 1319 (2d Cir. 1975). There may be a tendency to only ask

what happened to the requested evidence and what effect on the trial should its loss have. To so restrict the inquiry, however, presumes too much. In a particular case the State may be able to claim that the evidence is not subject to discovery or that there is no duty to preserve it. *See* Super. Ct.Crim.R. 16(b). *See also DeSalvatore v. State,* Del.Supr., 163 A.2d 244 (1960); *State v. Traenkner,* Del.Super., 314 A.2d 202 (1973); Annot., 19 A.L.R.4th 509, 515–18 (1983). But any claim that potentially exculpatory evidence was lost or destroyed by the State can only be decided after each element of the above analysis has been considered.

### B.

Superior Court Criminal Rule 16(b) allows a defendant "to inspect and copy or photograph designated books, papers, documents, tangible objects, buildings or places, copies or portions thereof which are within the possession, custody or control of the State...." In *State v. Winsett,* Del.Super., 200 A.2d 237 (1964), the trial court

---

that the evidence officer took the clothing after the hospital staff took it from the victim. This latter interpretation is supported by the testimony of a nurse at the hospital: the victim's clothing was bagged, labeled, and then given to a detective.

3. Rule 16 provides in pertinent part:

(a) Defendant's Statements; Reports of Examinations and Tests; Defendant's Grand Jury Testimony. The defendant may serve upon the Attorney General a request to permit the defendant or someone acting in his behalf to inspect and copy or photograph any relevant (1) written or recorded statements or confessions made by the defendant, or a co-defendant (whether or not charged as a principal, accomplice or accessory in the same or in a separate proceeding), or copies thereof, and the substance of any oral statement which the State intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a state agent which are known by the Attorney General to be within the possession, custody or control of the State, (2) written reports of autopsies, ballistics tests, fingerprint analyses, handwriting analyses, blood, urine and breath tests, and written reports of physical or mental examination of

the defendant or the alleged victim by a physician, dentist or psychologist made in connection with the particular case, or copies thereof, which are known by the Attorney General to be within the possession, custody or control of the State, and (3) recorded testimony of the defendant before a grand jury.

(b) Other Books, Papers, Documents or Tangible Objects. The defendant may serve upon the Attorney General a request to permit the defendant or someone acting on his behalf to inspect and copy or photograph designated books, papers, documents, tangible objects, buildings or places, copies or portions thereof which are within the possession, custody or control of the State, upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable. This subdivision does not authorize the discovery or inspection of reports, memoranda, or other internal State documents made by agents in connection with the investigation or prosecution of the case, except as provided in subdivision (a) of this rule, or of statements made by State witnesses or prospective State witnesses (other than the defendant or a co-defendant) to agents of the State.

ordered production, pursuant to Rule 16,[4] of both the car, which the defendants were using when the victim was killed, and the alleged weapon. As the court stated, the car and the weapon were tangible objects apparently obtained from the defendants and were clearly material to the defense. Thus, disclosure was required under Rule 16. *Id.* at 238.

Here, Deberry first asked for a list of materials and objects that would have been subject to disclosure. We assume that Deberry intended to use this list to prepare a subsequent discovery request, specifying as required by Rule 16(b) the particular items he wished to inspect or copy. *See State v. Traenkner,* Del.Super., 314 A.2d 202 (1973); Super.Ct.Crim.R. 16(b). In any event, Deberry's clothing clearly was subject to disclosure under Rule 16(b), in accordance with *Winsett.*[5] Furthermore, the State did not object to disclosure on grounds of immateriality or that the request was unreasonable. See Super.Ct. Crim.R. 16(b). The State, therefore, is precluded from now arguing that the clothing, if preserved, was not subject to disclosure under Criminal Rule 16. Supr.Ct.R. 8.

### C.

The second step in our analysis—the State's duty to retain discoverable evi-

dence—is well settled: the failure of the government "to take adequate steps to preserve evidence may deny a defendant due process and thereby jeopardize otherwise viable convictions". *E.g., Government of the Virgin Islands v. Testamark,* 570 F.2d 1162, 1165–66 & n. 7 (3d Cir.1978) (collecting cases). The requirement of preservation is not explicitly set forth in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or in Superior Court Criminal Rule 16, but as was observed in *United States v. Bryant,* 439 F.2d 642, 651 (D.C.Cir.1971):

It is most consistent with the purposes of those safeguards to hold that the duty of disclosure attaches in some form once the Government has first gathered and taken possession of the evidence in question. Otherwise, disclosure might be avoided by destroying vital evidence before prosecution begins or before defendants hear of its existence . . . . Only if evidence is carefully preserved during the early stages of investigation will disclosure be possible later.

We fully endorse this view, and hold that the State's duty to disclose evidence includes a duty to preserve it as well. The obligation to preserve evidence is rooted in the due process provisions of the four-

---

**4.** At the time of the *Winsett* decision, Rule 16 read:

Upon motion of a defendant at any time after the filing of the indictment or information, the court may order the Attorney General to permit the defendant to inspect and copy or photograph designated books, papers, documents, tangible objects, confessions or written statements obtained from or belonging to the defendant or a co-defendant or obtained from others by seizure or by process upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable. The order shall specify the time, place and manner of making the inspection and of taking the copies and photographs and may prescribe such terms and conditions as are just.

**5.** As we have noted, determining whether the clothing would have been discoverable under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) is an artificial exercise since the

clothing is not available for review. If Deberry's clothing did not contain any blood or semen stains or hair, this would have supported his denial of any sexual activity with the victim. The only evidence linking Deberry to the rape was the victim's account, and the physical and medical evidence was inconclusive at best. The verdict is therefore based on what amounts to a bare minimum of evidence, and the absence of hairs and stains on Deberry's clothes was pertinent to the issue of reasonable doubt. Since the defense only made a general *Brady* request, the clothing is material for *Brady* purposes only if in the context of the entire record, the clothing would create a reasonable doubt not otherwise present. *Agurs,* 427 U.S. at 112, 96 S.Ct. at 2401–2402. Assuming the absence of hair or stains on the clothing, it clearly would have been discoverable under *Brady* and *Agurs.* *See also Stokes v. State,* Del.Supr., 402 A.2d 376 (1979).

teenth amendment to the United States Constitution and the Delaware Constitution, article I, section 7. The duty of preservation extends not only to the Attorney General's office, but all investigative agencies, local, county, and state. *Bryant,* 439 F.2d at 650. *See Barbee v. Warden,* 331 F.2d 842 (4th Cir.1964); *Lewis v. United States,* D.C.Ct.App., 393 A.2d 109 (1978), *aff'd on rehearing,* 408 A.2d 303 (1979); *State v. Giles,* Md.Ct.App., 239 Md. 458, 212 A.2d 101 (1965), *vacated and remanded on other grounds,* 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); *State v. Thurlow,* Me. Supr.Jud.Ct., 414 A.2d 1241 (1980). We do not purport to explicitly prescribe what administrative procedures are necessary for the Attorney General and the various law enforcement agencies in this State to fulfill the duty to preserve evidence. But we observe that under Superior Court Criminal Rule 16(b), a defendant need only show that an item "may be material to the preparation of his defense" to be discoverable. *Cf. United States v. Bailleaux,* 685 F.2d 1105 (9th Cir.1982) (disclosure of statements made by defendant); *United States v. Felt,* 491 F.Supp. 179 (D.D.C.1979) (discovery under criminal procedure rules requires lesser showing of materiality than does discovery under *Brady v. Maryland, supra.*). As a matter of prudence, therefore, agencies that create rules for evidence preservation should broadly define discoverable evidence to include any material that could be favorable to the defendant. *See Bryant,* 439 F.2d at 652 n. 21.

### D.

■ The last step in our analysis is whether the State has breached its duty to preserve evidence, and if so, what effect such breach has on this conviction. In making that analysis, we draw a balance between the nature of the State's conduct and the degree of prejudice to the accused. The State must justify the conduct of the police or prosecutor, and the defendant must show how his defense was impaired by loss of the evidence. In general terms, the court should consider "(1) the degree of negli-

gence or bad faith involved, (2) the importance of the lost evidence, and (3) the sufficiency of the other evidence adduced at the trial to sustain the conviction". *United States v. Loud Hawk,* 628 F.2d 1139, 1152 (9th Cir.1979) (Kennedy, J., concurring) [quoting *United States v. Higginbotham,* 539 F.2d 17, 21 (9th Cir.1976)].

■ More specifically, when examining the conduct of the State,

the court should inquire whether the evidence was lost or destroyed while in [the State's] custody, whether the [State] acted in disregard for the interests of the accused, whether [the State] was negligent in failing to adhere to established and reasonable standards of care for police and prosecutorial functions, and, if the acts were deliberate, whether they were taken in good faith or with reasonable justification .... It is relevant also to inquire whether the government attorneys prosecuting the case have participated in the events leading to loss or destruction of the evidence, for prosecutorial action may bear upon existence of a motive to harm the accused.

*Loud Hawk,* 628 F.2d at 1152 (Kennedy, J., concurring). Particularly relevant to this inquiry is testimony of persons who had custody of the material before its loss (and after its loss, assuming recovery), any procedures for preserving evidence, specific practices followed in the particular case, and steps taken to recover the lost material after discovery of the loss. *E.g., Brown v. United States,* D.C.Ct.App., 372 A.2d 557, 560–61 (1977); *Johnson v. United States,* D.C.Ct.App., 298 A.2d 516, 519 (1972). Against this must be weighed the prejudice to the defense resulting from the loss of such evidence. When analyzing prejudice, the court should consider:

the centrality of the evidence to the case and its importance in establishing the elements of the crime or the motive or intent of the defendant; the probative value and reliability of the secondary or substitute evidence; the nature and prob-

able weight of factual inferences or other demonstrations and kinds of proof allegedly lost to the accused; [and] the probable effect on the jury from absence of the evidence. . . .

*Loud Hawk,* 628 F.2d at 1152 (Kennedy, J., concurring). *See, e.g., United States v. Grammatikos,* 633 F.2d 1013, 1020 (2d Cir. 1980); *Government of the Virgin Islands v. Testamark,* 570 F.2d 1162, 1167 (3d Cir. 1978); *United States v. Bryant,* 439 F.2d 642, 653 (D.C.Cir.1971).

■ Having outlined the inquiry that a court should make, we find the record devoid of any explanations as to the loss of this evidence. Deberry says that the police removed all of his clothing from his room; one detective testified that another detective took the clothes; and the second detective denies doing so. In the usual situation, we would remand the case for additional findings of fact. *See Bryant,* 439 F.2d at 653; *Johnson,* 298 A.2d at 519. *See generally* 5 Am.Jur.2d *Appeal & Error* § 974, at 401–03 (1962). However, it is apparent that a remand in this case would add nothing to the record now before us. *See Bryant,* 439 F.2d at 653 (McGowan, J., concurring). Furthermore, the concept of balancing in itself implies that when loss of evidence has severely prejudiced the accused, the degree of culpability of the State is immaterial. *See Loud Hawk,* 628 F.2d at 1152 (Kennedy, J., concurring); *United States v. Miranda,* 526 F.2d 1319, 1324, 1327 (2d Cir.1975); *Cotton v. United States,* D.C.Ct.App., 388 A.2d 865, 871 (1978). Therefore, deciding this case on the record as it now stands is not inconsistent with the general analysis we have adopted.

■ Though the record contains a minimum of information about the loss of Deberry's clothing, we think that the responsibility for the lost evidence must lie with the State. First, Deberry was an itinerant race track worker. His meager possessions were all located in his room, including the clothes he allegedly wore during the attack. When the police took him into custody he had no way of preserving or protecting this all important physical evidence. On the other hand the police were in an absolutely superior position to do so, and one officer has identified another detective as having taken possession of those items. Second, in a crime of this type, it is not unreasonable to anticipate that the apparel of both the victim and the alleged perpetrator would be crucial evidence of the defendant's guilt or innocence. Certainly, the actions of the police reflect the importance of the clothing since they clearly obtained Beverly's clothes, and the record supports the conclusion that they seized Deberry's clothes as well. Having done so, the police had a duty to preserve such vital evidence. Thus, when physical evidence of this type is lost or otherwise becomes unavailable through some apparent default of the police, the State bears a heavy burden of overcoming the defendant's claim of prejudice. A haphazard explanation of the loss is insufficient, since anything less than the fullest possible accounting could stymie the defendant's efforts to show improper or inadequate handling of evidence and to obtain appropriate relief.

Though the track guard claimed to have checked an employee's pass with Deberry's name on it at the time Beverly claimed to have left and returned to the track complex, the only evidence linking Deberry to the actual rape was Beverly's account. The physical and medical evidence was inconclusive at best. If the clothing did not contain Beverly's hair, or blood from her serious hand wound, or semen stains, the absence of such evidence would support Deberry's denial of having intercourse with her. Admittedly, Deberry's disclaimer was less credible in light of the guard's testimony, corroborating Beverly's account of leaving and returning to the track, and the medical evidence that she had engaged in sexual intercourse, but that only underscores the potential importance of the clothing. The results of any scientific tests performed on the clothes were clearly important to either the prosecution or defense of the crime, and the weight of substitute evidence, in effect

only Deberry's denial, might well have been less in the minds of the jurors than that of any scientific test. The degree of prejudice caused by the loss of the clothing is more than sufficient to justify relief, particularly considering the duty imposed on the police to obtain and preserve physical evidence clearly within its control at the scene of a crime or the site of an arrest.

The failure of the State to produce Deberry's clothes upon request or to conduct scientific tests, as was done on the victim's apparel, permits us to infer that any scientific evidence obtained from such items would have been favorable to Deberry. The State's production of otherwise inconclusive scientific evidence, when presumably strong evidence was available (or would have been, if the evidence had been handled properly), implies that the strong evidence would have been adverse to the prosecution. *See Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939); 1 Wharton's Criminal Evidence § 145, at 246 (13th ed. 1972); 29 Am.Jur.2d *Evidence* § 178, at 221–23 (1967). Considering the circumstances leading to the loss of Deberry's clothing and the prejudice to his defense, the appropriate relief here can only be a reversal of these convictions. The State has the option of entering a nolle prosequi to any or all of the charges against Deberry or retrying him. *Cf. Waters v. State,* Del. Supr., 443 A.2d 500, 506 (1982). Because the State must bear the responsibility for the loss of this evidence, and the defendant therefore enjoys the inference that evidence of the clothing would be exculpatory in nature, in a retrial the State must stipulate that if Deberry's clothing was introduced it would not contain any evidence incriminating to him.

### III.

Deberry also challenges the admission into evidence of his identification by Beverly. He contends that the on-site confronta-

tion between them was unnecessarily suggestive and created a substantial likelihood of misidentification. This, according to him, led to an unreliable in-court identification by Beverly. The State responds that the confrontation was not unnecessarily suggestive or conducive to mistaken identification.

In this instance, the prompt on-site confrontation was not unnecessarily suggestive, being an "immediate product of the offense and defendant's apprehension". *Watson v. State,* Del.Supr., 349 A.2d 738, 740 (1975). *See Gates v. State,* Del.Supr., 424 A.2d 18 (1980); *Jenkins v. State,* Del. Supr., 413 A.2d 874 (1980); *Smith v. State,* Del.Supr., 352 A.2d 765 (1976); *Harris v. State,* Del.Supr., 350 A.2d 768, 770–71 (1975) (first show-up). Beverly knew the defendant and, in fact, had spent a considerable part of the previous day with him. She identified him initially by his first name and the bunkhouse in which he lived, and according to the police officer who was with her, she unhesitatingly identified Deberry as her assailant. The defense makes much of Beverly's inability to further describe Deberry, other than by the part in his hair. Certainly, a detailed description is always helpful, but we think such a requirement was unnecessary here since it is clear that Beverly knew Deberry. *See Watson,* 349 A.2d at 740 [quoting *Russell v. United States,* 408 F.2d 1280, 1284 (D.C.Cir.1969) ]. Assuming without deciding that we must consider the issue of reliability after finding that the procedures involved were not unnecessarily suggestive,[6] on the basis of the above facts we must conclude that the victim's identification of Deberry was reliable. *See Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). Because Beverly's out-of-court identification was admissible, the issue of her in-court identification need not be reached. *See Watson,* 349 A.2d at 741. *See also Baker v. State,* Del.Supr., 344 A.2d 240 (1975).

\* \* \*

REVERSED AND REMANDED.

---

6. *Vouras v. State,* Del.Supr., 452 A.2d 1165, 1169 (1982). *But see Watson,* 349 A.2d at 741.

*Cf. Harris,* 350 A.2d at 770–71; *Clark v. State,* Del.Supr., 344 A.2d 231, 237 (1975).

## ORDER ON CONSIDERATION OF THE STATE'S MOTION FOR REARGUMENT

This 16th day of February, 1983, the Court has before it the State's Motion For Reargument, submitted to us on February 14, 1983. It now appears that following issuance of our opinion on January 27, 1983, the State found the clothes seized at the time of defendant's arrest. The State also admits that these items have been in its possession at all times relevant to these proceedings, despite the fact that it was twice ordered by the trial court to search for and produce them, and on each occasion the State represented to the trial court that they could not be found. Indeed, the State denied both here and in the Superior Court that it ever had such items. Even now it continues to base its arguments on that premise. After carefully considering the State's position, we do not believe that this belated discovery of evidence, which the defendant has repeatedly sought at two separate trials, alters our conclusions. If anything, the circumstances which have now come to light only underscore the importance of and need for the rules we announced regarding the State's handling of evidence in criminal matters.

Accordingly, the Motion For Reargument is DENIED.