IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEVEN BAYNUM, | § | |
| | § | No. 168, 2015 |
| Defendant Below-Appellant, | § | |
| | § | Court Below: |
| v. | § | Superior Court of the |
| | § | State of Delaware |
| STATE OF DELAWARE, | § | |
| | § | |
| | § | Cr. I.D. No. 1310015013A |
| Plaintiff Below-Appellee. | § | |

Submitted: January 13, 2016
Decided: February 8, 2016

Before **STRINE**, Chief Justice; **HOLLAND** and **VALIHURA**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

Santino Ceccotti, Esquire, Office of Public Defender, Wilmington, Delaware for Appellant.

Maria T. Knoll, Esquire, Department of Justice, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

Pending before this Court is an appeal from the Superior Court's October 21, 2014 bench ruling, denying Steven Baynum's ("Baynum") Motion in Limine ("Motion") prior to his trial on charges stemming from an incident at the residence of Manisha Baynum ("Manisha"). The bench ruling was issued following an evidentiary hearing conducted in connection with Baynum's Motion, which sought dismissal of his case before trial or, in the alternative, a jury instruction pursuant to *Lolly v. State*[1] and *Deberry v. State*[2] on the theory that the State failed to collect or preserve potentially material evidence.

Baynum appeals his convictions and contends that the Superior Court erred in denying his Motion. Specifically, he urges that a *Lolly* instruction should have been provided to the jury following the State's alleged failure to collect and preserve a certain inconsistent statement made by Manisha while she was present in a New Castle County Police Department interview room. Baynum requests that his convictions be reversed.[3]

For the reasons set forth below, we AFFIRM the Superior Court decision of October 21, 2014 and Baynum's convictions.

---

[1] 611 A.2d 956 (Del. 1992).

[2] 457 A.2d 744 (Del. 1983).

[3] A jury found Baynum guilty of two counts of Burglary First Degree, with one count as a lesser included offense of Home Invasion; two counts of Unlawful Imprisonment Second Degree; two counts of Menacing; one count of Assault Third Degree; one count of Harassment; and one count of Offensive Touching. On January 21, 2015, the State filed a Motion to Declare Baynum a Habitual Offender pursuant to 11 *Del. C.* § 4214(a). On March 20, 2015, the Superior Court granted the State's motion. With respect to the Burglary First Degree charges, which the parties agreed to merge for sentencing purposes, the trial court sentenced Baynum to 17 years at Level V as a habitual offender. As to the remaining charges, the Superior Court sentenced Baynum to a total of four years and three months at Level V, suspended for decreasing levels of supervision.

## I.    RELEVANT FACTS AND PROCEDURAL BACKGROUND

Baynum and Manisha married in 2009.  In 2012, the couple experimented with having an "open marriage" and shared an intimate experience with Dakota Holdren ("Dakota").  Thereafter, Manisha was romantically involved with Dakota.  In September 2013, Manisha filed for divorce from Baynum.  That month, Manisha was granted a Family Court Order affording her exclusive use of 28 Harvest Lane in Newark, Delaware, a property owned by Baynum's grandparents.  The Order prohibited Baynum from accessing the residence and, as a result, he often stayed with his grandparents at their 951 New London Road residence, located on the same property as 28 Harvest Lane.[4]

On the evening of October 23, 2013, and in the early morning hours of October 24, Dakota and Manisha were at 28 Harvest Lane.  Interested in "check[ing] out the place," Baynum communicated with Manisha via text messages and phone calls regarding whether he could come over to 28 Harvest Lane.  After being dissuaded by Manisha, Baynum temporarily refrained from going to the house, although he "decided to put a ladder at the base of [28 Harvest Lane's] driveway . . . ."[5]

Later that evening, Manisha was awakened by noises emanating from the bathroom.  She directed her cell phone light towards the doorway of her bedroom, discovering a crouched Baynum, who then jumped on the bed, pulled a blanket off of Dakota, and started punching him.  After convincing Baynum to join her in the kitchen,

---

[4] Baynum testified that, in the period preceding October 23, 2014, he often stayed with Manisha and their children at 28 Harvest Lane, even after the Family Court Order was entered.
[5] A131 (Tr. 98:7-8).

2

Manisha dialed 9-1-1, but was unable to speak with an operator because Baynum "took the phone out of [her] hands" and "took the battery out of the phone."[6]

Thereafter, Baynum "dragged" Manisha back to the bedroom, where he proceeded to "tie up" Dakota utilizing an ethernet cord. Baynum then pushed Manisha onto her stomach and attempted to tie her hands together using an iPhone charging cord. Manisha testified that she bit Baynum on his arm during the struggle.[7] Baynum responded by punching her in the face and holding a knife to her throat.

At approximately 3:00 a.m. on October 24, New Castle County police officers were dispatched to 28 Harvest Lane in response to a "9-1-1 hang-up." When the officers arrived at the residence, they discovered a red ladder blocking access to the property's driveway. The officers knocked on the front door and announced themselves as police.[8] Upon hearing the officers, Dakota "ran towards the door," opening it, but then he returned to the bedroom after hearing Manisha "holler." When Dakota returned to the bedroom, Baynum "got up and ran." Manisha and Dakota then fled the residence through a side door, meeting the officers and stating that Baynum had a knife. When the officers ultimately searched the residences at 28 Harvest Lane and 951 New London Road, they did not find Baynum.

---

[6] Dakota and Manisha testified that, during the course of the scuffle, Baynum stole their cell phones. Further, while in the kitchen, Manisha sprayed Baynum with bleach and "picked up" a kitchen knife. Dakota testified that Manisha also possessed a "decorative sword" while in the kitchen. According to Manisha, however, Baynum held the decorative sword and "stuck it in the kitchen floor."

[7] Baynum testified that the bite mark that appeared on his arm after the incident was the result of the fact that he was "chewing" on his arm during his stint in a Maryland holding cell after his capture.

[8] Officer Brooks Fitzpatrick testified that, simultaneous with his knock on the front door, he "heard a loud scream, sort of like a shriek that came out from inside the residence."

Later in the morning on October 24, Baynum appeared at his grandparents' residence, explaining to his grandmother that "he had beat the crap out of the man that was living -- sleeping with his wife. And [Baynum] said [he] was just trying to defend [his] -- [his] wedding vows, reaffirming his marriage." After Baynum left, his grandmother informed the police. Ultimately, after a foot pursuit during which he eluded a Delaware State Trooper, Baynum was apprehended in Elkton, Maryland.

On October 24, 2013, Detective Steven Burse ("Burse") interviewed Manisha at the New Castle County Police Department. Burse conducted the initial portion of the interview in two segments, exiting the room once before re-entering with follow-up questions for Manisha after interviewing Dakota.[9] Both of the initial segments of the interview were video-recorded. After concluding the second segment, Burse turned off the video recording equipment because he deemed the interview over, and proceeded to get the Department's "evidence guys" to photograph Manisha and Dakota.

During the period between 8:51 a.m. and 9:51 a.m., Manisha was alone in the interview room, not being recorded, and placed at least two phone calls. One of Manisha's telephone conversations was overheard by Detective John Ziemba ("Ziemba") in the Department's "review room,"[10] and he subsequently informed Burse that

---

[9] The first segment of the interview was conducted between 6:54 a.m. and 7:54 a.m. The second segment of the interview was conducted between 8:43 a.m. and 8:51 a.m.

[10] The New Castle County Police Department has a room that contains closed circuit television monitors that simultaneously overlook each of the interview rooms in the station.

Manisha's discussion reflected possible "inconsistencies."[11] Burse, shortly after the video recording resumed at 9:51 a.m., entered the interview room for a third time and "confront[ed]" Manisha about the supposed asymmetry between the substance of her telephone conversation and her statements to the police.[12]

During the third interview segment, Burse asked Manisha where she first observed Baynum at the time of the incident, inquiring: "Are you sure? And the reason why I'm asking is because, um, I guess whoever you were talking to, you told them something different." After Manisha attempted to explain the alleged discrepancy, Burse stated: "But that's different from what you told the person you were just talking to." At trial, Burse testified that the purported inconsistency was with respect to the location in which Manisha first observed Baynum inside the residence at 28 Harvest Lane.[13] Specifically, Manisha told Burse that she first observed Baynum in the bedroom doorway when she was "lying in bed." According to Burse, Manisha's alleged inconsistent statement— spoken during the one hour of unrecorded time—"made mention of seeing [Baynum] when she came out of the bathroom, which obviously contradict[ed] her statement of lying in bed and seeing [Baynum] in the doorway."[14]

---

[11] Ziemba testified that he "[a]bsolutely" did not remember "what statement [Manisha] made that prompted [him] to speak up to Detective Burse[.]" Further, he testified that he did not know whether Manisha actually made an inconsistent statement.

[12] Notably, during the evidentiary hearing with respect to the Motion, Burse testified that he did not "remember whether [he] heard [the inconsistent statement] . . . or whether Detective Ziemba basically said, hey, there is something that she told you differently."

[13] Manisha also described herself as a "compulsive liar" during her interview with the police.

[14] The Superior Court engaged in a lengthy colloquy with Manisha regarding the substance of her phone calls during the unrecorded hour. Manisha suggested to the court that, during her phone calls, she stated that she observed Baynum from her bed.

At the conclusion of the October 21, 2014 evidentiary hearing, the Superior Court determined that the officers were not subject to a duty to collect, preserve, or "create" evidence of Manisha's statement. The court ruled that there was no evidentiary support for a finding of bad faith on the part of the police and the evidence in support of a finding of negligence was, at best, "slim." Further, the court observed that "secondary and substantive evidence" concerning the alleged inconsistent statement "remain[ed] available" to the parties, in view of the fact that Burse, Ziemba, and Manisha could be called to testify at trial.

## II.     ANALYSIS

### A.     *Contentions of the Parties and Standard of Review*

Baynum's argument on appeal centers on his contention that the Superior Court erred in deciding not to provide the jury with a *Lolly* instruction, in view of the State's alleged failure to collect and preserve Manisha's purported inconsistent statement made while present in a New Castle County Police Department interview room and subsequent to the initial conclusion of her questioning by Burse.[15] The State contends that the Superior Court properly concluded that the officers did not breach a duty to collect or preserve evidence, that Baynum had sufficient information regarding the perceived inconsistencies in Manisha's statements, that Baynum suffered no prejudice, and that there was overwhelming evidence of Baynum's guilt.

---

[15] Notably, the record reflects three possible inconsistent statements by Manisha with respect to where she first observed Baynum. Manisha suggested that she initially viewed Baynum in the doorway to her bedroom, when she came out of the bathroom, and when she and Dakota were awakened by Baynum punching Dakota.

6

This Court reviews the denial of a requested *Lolly* instruction *de novo*.[16]

**B.**      ***The Superior Court Properly Refrained from Providing the Jury with a* Lolly *Instruction***

In *Deberry*, this Court imposed a duty upon the State to preserve evidence which is material to a defendant's guilt or innocence.[17] In *Lolly*, this Court extended that duty to mandate that the State "gather evidence *ab initio*."[18] Where missing evidence is not case dispositive, a consequence for the State's failure to collect or preserve material evidence is a *Lolly* instruction, entitling the defendant to the inference that such evidence would have been exculpatory.[19] That is, "[a] missing evidence instruction, or '*Lolly*' instruction, tells the jury, in a case where the State has failed to collect or preserve evidence which is material to the defense, to assume that the missing evidence would have tended to prove the defendant not guilty."[20]

*Deberry* and its progeny set forth an approach for determining the relief appropriate when the State fails to collect or preserve material evidence: (1) Would the requested material, if extant in the possession of the State at the time of the defense request, have been subject to disclosure under Superior Court Criminal Rule 16 or *Brady*

---

[16] *McNair v. State*, 990 A.2d 398, 403 (Del. 2010) (citing *Hendricks v. State*, 871 A.2d 1118, 1123 (Del. 2005)).

[17] In *Deberry*, this Court observed that the "obligation to preserve evidence is rooted in the due process provisions of the [F]ourteenth [A]mendment to the United States Constitution and the Delaware Constitution, [A]rticle I, [S]ection 7." *Deberry*, 457 A.2d at 751-52 ("The duty of preservation extends not only to the Attorney General's office, but all investigative agencies, local, county, and state." (internal citations omitted)).

[18] *Johnson v. State*, 27 A.3d 541, 545 (Del. 2011) (citing *Lolly*, 611 A.2d at 960).

[19] *See id.* at 548-49 (citing *Hammond v. State*, 569 A.2d 81, 90 (Del. 1989); *Deberry*, 457 A.2d at 754)) ("The failure to gather and/or preserve case dispositive evidence will completely preclude a prosecution.").

[20] *McNair*, 990 A.2d at 400 n.1 (citing *Lolly*, 611 A.2d at 962 n.6).

7

*v. Maryland?*[21]  (2) If so, did the government have a duty to preserve the material?  (3) If there was a duty to preserve, was the duty breached, and what consequences should flow from that breach?  If it is determined that the State breached its duty to collect or preserve evidence, this Court will then undertake a separate three-part analysis to determine the consequences that flow from that breach.[22]  That three-part analysis involves an examination of:  "(1) the degree of negligence or bad faith involved, (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available, and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction."[23]

    i.    *The Duties to Collect, Preserve, and Disclose Potentially Material Evidence*

The State agreed that, if there were an inconsistent statement, it would have been subject to disclosure under both Criminal Rule 16(b) and *Brady*.[24]  But, here, the government was not subject to an existing duty to collect and preserve the inconsistent statement.  As this Court has stated previously, we have "declined to prescribe the exact procedures that the various law enforcement agencies in this State must follow in order to fulfill their duties to [collect and] preserve evidence."[25]  We have held, however, "that in

---

[21] 373 U.S. 83 (1963).

[22] *Hendricks*, 871 A.2d at 1124.  *See also Johnson*, 27 A.3d at 545-46.

[23] *Hendricks*, 871 A.2d at 1124 (citations omitted).

[24] In a colloquy with the Superior Court, the prosecutor stated:  "[T]he State feels that if there were an inconsistency, yes, it would be *Brady*, any of [Manisha's] statements would be turned over under Rule 16 or *Jencks*."

[25] *Johnson*, 27 A.3d at 547 (citing *Deberry*, 457 A.2d at 752).

8

fulfilling these duties, agencies should create rules for gathering and preserving evidence that are broad enough to encompass any material that could be favorable to a defense."[26]

Baynum argues that the State had a duty to preserve the entirety of Manisha's interview because the contents were material to his guilt or innocence. Baynum, however, conflates the "interview" with the one hour of time after Burse concluded his questioning and during which the alleged inconsistent statement was made. The record evidence reflects—and Baynum does not contend otherwise—that the police recorded each instance Burse questioned or "interviewed" Manisha and provided such recordings to Baynum. The alleged inconsistent statement was made while Manisha was alone in the New Castle County Police Department interview room and talking on her cell phone.

After learning of potential inconsistencies, Burse activated the recording equipment, returned to the interview room, re-initiated the interview with Manisha, and confronted her about the purported differences in her statements. As the Motion itself reflects, the State gathered and preserved Burse's questioning of Manisha, provided Baynum with evidence of the alleged inconsistent statement in preparation of his defense, and, therefore, disclosed the impeachment evidence in its possession. We are not prepared to hold, on this record, that the State was required to keep the recording equipment running once Burse had concluded the questioning. Thus, we agree that, on these facts, the Superior Court did not err in concluding that the State did not breach a duty to collect or preserve evidence.

---

[26] *Id.*

ii.    *The Consequences Flowing from a Breach of the Duty to Collect or Preserve Evidence, and Baynum's Claim of Prejudice*

Even if the State had breached its duty to collect or preserve evidence, such a breach neither precluded prosecution nor prejudiced Baynum. As noted above, "[t]he consequences that should flow from a breach of the duty to gather or preserve evidence are determined in accordance with a separate three-part analysis which considers:" (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction.[27] These factors are also applicable where a "defendant alleges prejudice because the State failed to preserve or gather evidence . . . ."[28]

Baynum concedes that there is no evidence of bad faith on the part of the police in failing to gather or preserve Manisha's inconsistent statement. But he urges that there was a "high degree of negligence involved." Specifically, he argues that the New Castle County Police Department "policy with respect to recording procedures is to keep recording even when the officer has left the room." The record contradicts this assertion. During the evidentiary hearing, Burse testified that *his* revised policy, *since the incident but not prior to*, is to leave the recording device on when the interview subject is alone in the interview room and no interview is being conducted. However, Ziemba testified that he was not aware of an official policy as to the recording of interviews at the Department's headquarters. Further, in a colloquy with the Superior Court, counsel for

---

[27] *Id.* at 545-46 (citations omitted).

[28] *Bailey v. State*, 521 A.2d 1069, 1090-91 (Del. 1987) (emphasis removed) (citation omitted).

Baynum acknowledged that he was not aware of a written or court-ordered policy regarding the recording of statements. The Superior Court concluded that, at best, there was a "slim" showing of negligence, but tempered such conclusion by finding that there was "no written procedure, the practice up until this point was that [the police] don't record when . . . nobody is asking questions in [the interview room]."[29] The Superior Court added that "there's nothing that demonstrates bad faith."

With respect to the importance of direct evidence of Manisha's missing statement considering the probative value and reliability of secondary or substitute evidence that remained available, the Superior Court determined that secondary and substitute evidence remained available here. Ziemba, Burse, and Manisha were available sources of secondary or substitute evidence regarding the alleged inconsistent statement.[30] Likewise, the third segment of Burse's interview with Manisha, wherein he questioned her regarding the purported inconsistent statement, was recorded and available to Baynum. At trial, counsel for Baynum questioned Burse and Manisha regarding the alleged inconsistent statement.[31] During summation, defense counsel argued to the jury that Manisha made an inconsistent statement about where she first observed Baynum and

---

[29] A69 (Tr. 178:12-18).

[30] As noted above, during the October 21, 2014 evidentiary hearing, the Superior Court also engaged in a lengthy colloquy with Manisha regarding her purported inconsistent statement.

[31] Detective Ziemba provided testimony concerning the purported inconsistent statement at the October 21, 2014 evidentiary hearing.

11

suggested that the jurors were unable "to hear what [Manisha] said . . . because the police decided not to record [her statement]."[32]

The other evidence produced at trial was sufficient to sustain a conviction beyond a reasonable doubt. Manisha and Dakota both testified that Baynum struck Dakota, and Burse testified that Dakota had a "swollen upper lip." Manisha also stated that she placed a call to 9-1-1 using a landline but was unable to speak with an operator, and the police responded to a "hang-up" at 28 Harvest Lane. Upon arriving at 28 Harvest Lane, the officers discovered a ladder at the base of the driveway, which Baynum admitted to placing there "to make sure that [Manisha] couldn't leave . . . without letting [him] know . . . ." Manisha and Dakota also testified that Baynum attempted to tie them up, utilizing an iPhone charging cord and a yellow ethernet cord, respectively. The officers discovered an iPhone charging cord at the kitchen entranceway upon searching 28 Harvest Lane, and Officer Fitzpatrick observed Dakota fleeing from the residence with "his hands tied with some sort of cord" and suffering from a "panic attack of some sort." Manisha also testified that she bit Baynum in the course of his attempt to "tie" her up, and that Baynum punched her in response. Baynum had a bite mark on his arm when he was taken into custody, and Manisha had a contusion on her forehead.

Finally, when the officers searched the residence at 951 New London Road, they did not discover Baynum, who testified that he "figured that [Manisha] had called the police and assumed that she had told them [he] was either [at 28 Harvest Lane] or had

---

[32] B17 (Tr. 136:13-22) ("The[ police] had to have heard something because they went in and questioned [Manisha] about it. They confronted her. What you just said is different than what you're telling me.").

attacked her or had threatened her and that she was trying to get [him] locked up . . . ." At approximately 3:30 a.m. on October 24, 2013, aware of the police presence at 28 Harvest Lane, Baynum "fled" from his grandparents' house through "trees and brambles" to a state park. Baynum reappeared at 951 New London Road later that day and told his grandmother that he attacked Dakota, ultimately leaving the residence again before being apprehended in Maryland. Thus, based upon the evidence, Baynum cannot establish prejudice and the substantial evidence produced at trial was sufficient to sustain a conviction beyond a reasonable doubt.

### III. CONCLUSION

The Superior Court properly denied Baynum's request for dismissal or, in the alternative, the provision of a *Lolly* instruction to the jury. While the State agrees that the purported inconsistent statement would have been subject to disclosure under Criminal Rule 16 and *Brady*, the State had no established duty to collect and preserve such statement. Moreover, the State did not act negligently or with bad faith, there was available secondary and substitute evidence of significant probative value and reliability, and the other evidence produced at trial was sufficient to sustain a conviction beyond a reasonable doubt.

For the foregoing reasons, the Superior Court's judgment of October 21, 2014 and Baynum's convictions are AFFIRMED.

13