NUMBER 13-06-665-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


CANDELARIO MARTINEZ, JR., Appellant,


v.



THE STATE OF TEXAS, Appellee.

 

On appeal from the 93rd District Court 

of Hidalgo County, Texas

 


MEMORANDUM OPINION


Before Justices Rodriguez, Garza, and Vela


Memorandum Opinion by Justice Vela



 Appellant, Candelario Martinez, Jr. (Martinez), was indicted for possession with
intent to deliver cocaine weighing more than one gram and less than four grams. See Tex.
Health & Safety Code Ann. § 481.112(a), (c) (Vernon 2003). He filed pretrial motions to
suppress evidence and to dismiss, which the trial court denied following hearings on each
motion. Pursuant to a plea agreement, (1) Martinez pleaded no contest to the offense, and
the trial court sentenced him to eight years' community supervision, plus a $2,000 fine. 
Martinez presents five issues on appeal. We affirm.

A. Factual Background


 At approximately 2:16 a.m. on August 7, 2005, Officer Lanny Swanson was on
patrol in Weslaco when he saw Martinez drive away from a bar. Martinez's vehicle did not
have a front license plate, so Swanson activated his overhead lights and stopped him. 
Swanson testified Martinez "had been drinking," "was slightly slurring of speech," and "[a]
little off balance." Swanson conducted three field-sobriety tests on Martinez, all of which
he passed.

 After conducting the tests, Swanson obtained Martinez's oral consent to search the
vehicle. He testified that he wanted to search the vehicle because, "[w]e had several
[Crime Stoppers] tips that he [Martinez] sells narcotics and he usually carried a weapon in
the floorboard of his vehicle." (2) Swanson said that the tips were "[f]airly recent" and that he
received "another one two weeks ago."

 Swanson's search of the vehicle turned up a "Sandwich bag with six smaller corner
pieces of the sandwich bag cut with a white substance in it, powder." He said that he found
the bag in "[t]he center console between the two seats . . . . [I had] to lift it up and there
was an area underneath it." He also testified that the search "was brief. We had cause
to where it was at."

 On cross-examination, Swanson testified that his patrol car had a video camera,
which recorded whenever he activated his overhead lights. He explained that even though
he conducted the field-sobriety tests while Martinez stood in front of his patrol car, the
camera did not record the tests because the videotape was "full." When the trial court
asked him, "[S]o to your knowledge there was no recording made of the stop?", he replied,
"Correct, because it wasn't submitted. So I don't believe there was one."

 Swanson said the field-sobriety tests took approximately five or six minutes. When
counsel asked him, "And you started these exams shortly after pulling him over; is that
right?", he replied, "Correct." Swanson testified that he searched the passenger in
Martinez's car, but that he did not perform field-sobriety tests on the passenger. (3) 

 Martinez testified that after Swanson stopped him, he got out of the vehicle and
gave him his driver's license and "insurance." Swanson told him that he had no front
license plate and that he "smell[ed] a little bit of alcohol." Martinez told him that he drank
"a couple of beers." Martinez further testified:

 And then he [Swanson] asked me, . . . if I had any dead bodies or machine
guns in my car. I said, no, sir. And he said, Do you mind if I took [sic] a
look? And I said, As a matter of fact, I do. I don't like anybody going through
my stuff. And then he said, I smell alcohol. Would you mind stepping over
here behind the vehicle because I want to make sure that I get this on video. 
And I said, okay. So we stepped in between the cars. And then he did the
light test. It was the first test. And after the light test he said, you didn't do
too bad. He said, if you let me search your vehicle and you're free to go. 
And I said, no. I said, I don't like anybody going through my stuff . . . . 


 * * *

 And then I said, . . . I just don't like anybody going through my stuff. And
then he said, Okay. Well, let's do this other field sobriety test.


 * * *

 That one was the . . . one-leg stand and count to 30.


 * * *

 I performed the exam and then he again asked me, he said, okay. You
didn't do too bad . . . . [H]e said, you skipped number 19 . . . . He said if you
give me--if I can search your vehicle and I don't find anything, you're free to
go. And I said, no, sir, I said, you can't search my vehicle. And he said, you
know what, it wouldn't take anything for me to get the K-9 unit out here right
now. And then we'll see. And I said, well do whatever you want, you know,
I told him, do or go ahead and do it, I said. Go ahead and do it. And then
he said, all right, let's do this other test.


 * * *

 So I performed the exam, the field sobriety test,[ (4)] and then after that, he said
that he was going to impound--he said, why don't you save yourself all the
trouble because I'm going to impound your car. He said, and let search [sic]
your vehicle and if I don't find anything you're free to go.


 * * * 

 And I said, you know what, do whatever you want to do. You're going to do
whatever you want to do anyway.


 And at that point, he took off to my car. There wasn't any backup yet or
anything . . . . I guess he kept searching, and then he came out with a bag
full of--with bags.


 At this point, counsel questioned Martinez as follows:

 Q. Now, by this time you'd already said you didn't want to consent, at least
on a few occasions; is that correct?


 A. Yes, yes, sir.


 Q. And he [Swanson] didn't honor that request, did he?


 A. No, sir. My choices were, either you take the field sobriety or consent
and you're free to go. Those are my choices.


 Q. So, finally when you, I guess said, well, do whatever you want, you didn't
do that freely, right?


 * * * 


 A. At that point I determined that I--that I was going to go to jail anyway and
my car was going to get impounded so I said do whatever you want. You're
going to do whatever you want anyway.


 Q. But did you feel coerced into giving consent?


 A. Yes, sir, definitely, yes.


 * * *


 Q. Now, also you said he wanted you to do the field sobriety test because
there was a videotape, right?


 A. Yes.


 Q. And this videotape would confirm to what you're testifying to today?


 A. That's correct . . . . 


 Q. And that would show you denying consent, right?


 A. Yes.


 * * * 

 Q. At one point, he told you that you did passed [sic] the exams, right-


 A. Yes, he did.


 Q. But he kept on asking you for consent to search, right?


 A. Yes, right.


 Q. Even after the purpose of the stop had concluded; is that correct?


 A. Yes.


 On cross-examination, Martinez admitted he had a prior conviction for possession
of marihuana, a third-degree felony.

 After hearing argument from both sides, the trial court denied the motion to
suppress, stating "the officer had probable cause for the arrest and the search." 

B. Discussion


1. Motion to Suppress

 By his first three issues, Martinez argues the trial court erred in denying his motion
to suppress because his detention was "overly prolonged," and any subsequent alleged
consent to search was not voluntary, in violation of the Fourth Amendment to the United
States Constitution, Article 1, Section 9 of the Texas Constitution, and article 38.23 of the
Texas Code of Criminal Procedure. See U.S. Const. amend IV; Tex. Const. art. 1, § 9;
Tex. Code Crim. Proc. Ann. art. 38.23 (Vernon 2005). (5) 

Standard of Review


 In St. George v. State, 237 S.W.3d 720 (Tex. Crim. App. 2007), the court stated:

 Whether a specific search or seizure was reasonable is a mixed
question of law and fact and is conducted de novo. We review a trial court's
ruling on a motion to suppress evidence under a bifurcated standard of
review. We do not engage in our own factual review; rather, the trial judge
is the sole trier of fact and judge of credibility of the witnesses and the weight
to be given to their testimony. Trial courts are given almost complete
deference in determining historical facts. We review the record to determine
whether the trial court's ruling is supported by the record and correct under
some theory of law applicable to the case.


Id. at 725 (citations omitted). "We conduct a de novo review of evidence when the
resolution of mixed questions of law and fact do not turn on an evaluation of credibility and
demeanor." Id.

 When, as in this case, there are no explicit fact findings, and neither party timely
requested findings and conclusions, we imply the necessary fact findings that would
support the court's ruling if the evidence, viewed in the light most favorable to the court's
ruling, supports those findings. State v. Kelly, 204 S.W.3d 808, 819 (Tex. Crim. App.
2006). We then review the court's legal ruling de novo, unless the implied fact findings
supported by the record are also dispositive of the legal ruling. Id.



Reasonableness of the Detention

 The Fourth Amendment to the United States Constitution and Article 1, Section 9
of the Texas Constitution guarantee the right of the people to be secure against
unreasonable searches of their persons, houses, papers, and effects. See U.S. Const.
amend. IV; Tex. Const. art.1,§ 9. In deciding whether Martinez's detention was
reasonable, we view the trial court's factual findings in the light most favorable to his ruling,
but we decide the issue of reasonableness as a question of Fourth Amendment law under
Supreme Court precedent. Kothe v. State, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004). In
Kothe, the court noted that the Supreme Court has stated that "Fourth Amendment
'reasonableness' is measured 'in objective terms by examining the totality of the
circumstances'; it 'eschew[s] bright-line rules, instead emphasizing the fact-specific nature
of the . . . inquiry.'" Id. (quoting Ohio v. Robinette, 519 U.S. 33, 39 (1996)).

 Routine traffic stops are analogous to investigative detentions and are governed by
Terry v. Ohio, 392 U.S. 1 (1968). Martinez v. State, 236 S.W.3d 361, 369 (Tex. App.-Fort
Worth 2007, pet. dism'd); Gansky v. State, 180 S.W.3d 240, 242-43 (Tex. App.-Fort Worth
2005, pet. ref'd). A Terry analysis has two prongs. First, a court must decide if an officer's
action was justified at its inception. Id. Second, the court must determine whether the
search and seizure was reasonably related in scope to the circumstances that justified the
interference in the first place. St. George, 237 S.W.3d at 726; Kothe, 152 S.W.3d at 63.



Whether Swanson's Action was Justified at its Inception

 Swanson's stop was valid because he saw Martinez commit a traffic violation by
failing to have a front license plate. See Tex. Transp. Code Ann. § 502.404 (Vernon Supp.
2007) (defining offense of operating passenger car on public highway without a license
plate at the front and rear of the vehicle). His subsequent detention of Martinez pursuant
to that violation is considered to be valid as well. Garcia v. State, 827 S.W.2d 937, 944
(Tex. Crim. App. 1992) ("As long as an actual violation occurs, law enforcement officials
are free to enforce the laws and detain a person for that violation, regardless of whatever
the usual practices or standards of the local law enforcement agency are and regardless
of the officer's subjective reasons for the detention.") (emphasis in original). Because of
the Crime Stoppers' tips, Swanson evidently suspected that Martinez was involved in drug
activity when he stopped him for failing to have a front license plate, but this fact alone
does not render the traffic stop improper. Stops and detentions that pertain to the original
violation do not exceed the bounds of the Fourth Amendment. See id.

Whether the Search and Seizure was Reasonably Related in Scope to the Circumstances
Justifying the Interference in the First Place


 Under the second Terry prong, an investigative detention must be temporary and
last no longer than necessary to effectuate the purpose of the stop. See Florida v. Royer,
460 U.S. 491, 500 (1983); Kothe, 152 S.W.3d at 63; (6) Davis v. State, 947 S.W.2d 240, 243
(Tex. Crim. App. 1997). Once an officer concludes the investigation of the conduct that
initiated the stop, a continued detention is permitted only if there is reasonable suspicion
to believe another offense has been or is being committed. Saldivar v. State, 209 S.W.3d
275, 282 (Tex. App.-Fort Worth 2006, no pet.). See Davis, 947 S.W.2d at 243, 245;
McQuarters v. State, 58 S.W.3d 250, 256 (Tex. App.-Fort Worth 2001, pet. ref'd); see also
Ohio v. Robinette, 519 U.S. 33, 41 (1996) (Ginsburg, J., concurring) (Once police satisfy
the reason for the stop, they may not use the stop as a fishing expedition for unrelated
criminal activity.).

 In analyzing the reasonableness of the detention, we bear in mind that during a
routine traffic stop, an officer has the right to check for outstanding warrants and request: 
(1) a driver's license; (2) insurance papers; and (3) identification. See Davis, 947 S.W.2d
at 245. The officer may also question the driver about ownership of the vehicle, the driver's
destination, and the purpose of the trip. See Powell v. State, 5 S.W.3d 369, 377 (Tex.
App.-Texarkana 1999, pet. ref'd). After making a stop for a traffic violation, an officer may
rely on all of the facts ascertained during the course of his or her contact with a defendant
to develop articulable facts that would justify a continued detention. Sims v. State, 98
S.W.3d 292, 295 (Tex. App.-Houston [1st Dist.] 2003, pet. ref'd); Powell, 5 S.W.3d at 377.

 The United States Supreme Court has refused to place any rigid time limits on Terry
stops; instead, the issue is "'whether the police diligently pursued a means of investigation
that was likely to confirm or dispel their suspicions quickly, during which time it was
necessary to detain the defendant.'" Kothe, 152 S.W.3d at 64-65 (quoting United States
v. Sharpe, 470 U.S. 675, 685-86 (1985)).

 Application of Law


 Martinez argues that Swanson "decided to prolong the detention for the sole
purpose of getting consent to search, and it was at that moment that a constitutional
violation occurred." We disagree.

 After Swanson stopped Martinez, he smelled alcohol and noticed that Martinez had
slurred speech and was unsteady. Thus, he had reasonable suspicion to believe Martinez
had either committed or was committing another offense, namely DWI. This permitted him
to continue the detention in order to administer the field-sobriety tests. See Saldivar, 209
S.W.3d at 282; Davis, 947 S.W.2d at 245; McQuarters, 58 S.W.3d at 256. The evidence
showed that Swanson started the field-sobriety tests "shortly after" stopping Martinez and
that the tests took approximately five or six minutes. The evidence does not show that the
detention lasted longer than was necessary to effect the purpose of the stop. Royer, 460
U.S. at 500; Kothe, 152 S.W.3d at 63; Davis, 947 S.W.2d at 243, 245; see Sharpe, 470
U.S. at 685-86 (declining to "establish a per se rule that a 20-minute detention is too long"
under Terry). (7)

 We conclude that Swanson diligently pursued a means of investigation that was
likely to either confirm or dispel his suspicions quickly, during which time it was necessary
to detain Martinez. See Kothe, 152 S.W.3d at 64-65. The evidence does not show that
Swanson was purposefully prolonging the detention or that the stop lasted longer than
necessary to effect the purpose of his investigation. Therefore, the investigative detention
was reasonably related in scope to the circumstances that justified the stop and detention
in the first place. See Terry, 392 U.S. at 29; St. George, 237 S.W.3d at 726; Kothe, 152
S.W.3d at 63. Viewing the totality of the circumstances in the light most favorable to the
trial court's ruling, we hold that Swanson's actions were reasonable under the
circumstances, and that the detention as a whole was reasonable. Because neither the
initial stop nor its duration violated the Fourth Amendment, Martinez's consent to search
his car was not unconstitutionally tainted and, therefore, the evidence seized from his car
need not be suppressed under the Fourth Amendment or article 1, section 9. (8)

2. Voluntariness of Consent

 By this same issue, Martinez challenges the voluntariness of his consent to search. 
He states that his "alleged consent was not an independent act of free will."

 In Davis, the Court of Criminal Appeals stated that after officers determine a driver
is not intoxicated, continued detention of the driver and the search of his car without his
consent is unreasonable when not supported by reasonable suspicion of other criminal
activity. 947 S.W.2d at 243-45. To show that the search was made with consent, the
State must prove by clear and convincing evidence, based on the totality of the
circumstances, that the defendant gave consent freely and voluntarily. Reasor v. State,
12 S.W.3d 813, 818 (Tex. Crim. App. 2000); Saldivar, 209 S.W.3d at 284; State v. Hunter,
102 S.W.3d 306, 310 (Tex. App.-Fort Worth 2003, no pet.). Voluntariness is determined
from all the circumstances surrounding the consent. Schneckloth v. Bustamonte, 412 U.S.
218, 248-49 (1973); Saldivar, 209 S.W.3d at 284-85. "To be voluntary, consent must 'not
be coerced, by explicit or implicit means, by implied threat or covert force.'" Saldivar, 209
S.W.3d at 285 (quoting Carmouche v. State, 10 S.W.3d 323, 331 (Tex. Crim. App. 2000)).

 Swanson testified that when he asked Martinez if he could search the vehicle,
Martinez replied, "'Yes, I have nothing to hide.'" Swanson stated that when obtaining
Martinez's consent, he did not threaten him, did not use physical force, and did not make
any threatening gestures. Swanson also testified that during the encounter, he did not
draw his weapon, did not strike Martinez with his billy club, did not use pepper spray on
him, and spoke to him in a normal conversational manner.

 Under the applicable standard of review, we defer to the trial court's assessment of
Swanson's and Martinez's credibility. See Ross v. State, 32 S.W.3d 853, 855 (Tex. Crim.
App. 2000) (at suppression hearing, judge may believe or disbelieve all or any part of a
witness's testimony); State v. Ballard, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999) (at
suppression hearing, trial court is sole trier of fact and judge of witness's credibility and
weight to be given their testimony). Viewing the evidence in the light most favorable to the
trial court's ruling, then, we infer that the trial court believed Swanson's testimony. Ross,
32 S.W.3d at 855; Ballard, 987 S.W.2d at 891. Because the determination of whether
consent was voluntary in this case turns on the credibility of the witnesses, we defer to the
trial court's implied finding that consent was voluntarily given. Guzman v. State, 955
S.W.2d 85, 88-89 (Tex. Crim. App. 1997); Perez v. State, 103 S.W.3d 466, 468 (Tex.
App.-San Antonio 2003, no pet.). We overrule the first three issues.

3. Missing Evidence

 By issues four and five, Martinez argues the trial court erred in denying his motion
to dismiss (9) due to the loss or destruction of potentially useful and/or exculpatory evidence,
in violation of the Due Process Clause of the United States Constitution and the Due
Course of Law Provision of the Texas Constitution. See U.S. Const. amend. XIV; Tex.
Const. art. 1, § 19. Martinez argues that had the State retained the videotape of his field-sobriety tests, the tape would have shown that he did not consent to the search.

 At the dismissal hearing, defense counsel called one witness: Swanson. He
testified that at the time he began his patrol shift during which he stopped Martinez, his
patrol car's video camera was working. He stated that when an officer finishes a shift, the
VHS tape "stays in . . . [the patrol car] until it finishes and then it's replaced." He also
testified that when the VHS tape is "[f]ull . . . a supervisor pulls it out and it's held on to it
[sic] for 90 days, I believe, unless if something arises to where it needs to be held on." 
When the trial court asked him, "And do you know do they reuse the tapes and tape over
them or . . .", he replied, "Yes, sir, we do." At that point, the following exchange occurred
between defense counsel and Swanson:

 Q. [B]efore you begin a shift you can look at the videotape and determine if
it's full or not full or . . .


 A. Correct. You can view the little meter deal on there.


 Q. Do you remember looking at this videotape before you started your shift?


 A. No, I can't say for sure where it was at, no.


 Q. Now, when the tape is full, does a light come on the squad car saying
that the tape is full?


 A. The screen blinks. I believe. The screen or the little lights on the screen
blink and it won't record.


 Q. Do you remember that light coming on that night?


 A. (Nods in the negative.)


 Q. Now, you say sometimes these tapes, I guess get recorded over; is that
correct?


 A. Correct.


 Q. When does that happen?


 A. When a videotape is pulled from the vehicle it's held on to, I believe by
law it's 90 days, it has to be held on to. After 90 days, it's put back up into
the briefing room where they'll erase whatever is on it and put it up to be
reused.


 Swanson further testified that during his shift on the night in question, he made
approximately five stops prior to stopping Martinez. After he stopped Martinez, he went
off duty. He said that if he arrested a person for DWI, the videotape would be held longer
than 90 days, and it would be submitted as evidence. When the trial court asked Swanson
if he saved the video from Martinez's case, he replied, "There was no video as far as I
know. I believe the videotape had expired. But if it was, the video from that car was saved
for, due to the state law of 90 days, the 90 days has elapsed by now." Swanson said that
he did not erase the tape, and that he did not request that the tape be saved. He said that
"[i]f I arrest someone and I believe the video will help me in court, I will save it. I did not
have one on this case so I don't believe it was running." He also testified:

 If there was a tape of this [appellant's] stop, I would have saved it. But
during the previous stops, it might have expired. The tape ran out and on
this stop I did not have it. But on these [the previous] stops, I would not have
put it as evidence because there would be no reason to.


 He said that if the tape would have recorded Martinez's stop, he would have saved
it. He could not say for sure when "the tape ran out."

Federal Due Process Violation


 To demonstrate reversible error under Brady v. Maryland (10) and United States v.
Bagley (11) from the State's failure to disclose exculpatory evidence, a defendant must show
that: (1) the State failed to disclose evidence, regardless of the prosecutor's good or bad
faith; (2) the withheld evidence is favorable to the defendant; and (3) the withheld evidence
is material; that is, there is a reasonable probability that had the evidence been disclosed,
the outcome of the trial would have been different. Hampton v. State, 86 S.W.3d 603, 612
(Tex. Crim. App. 2002).

 In addressing whether the pretrial destruction of evidence constitutes a denial of due
process of law under the United States Constitution, the Supreme Court has drawn a
distinction between "material, exculpatory evidence" and "potentially useful evidence." 
State v. Vasquez, 230 S.W.3d 744, 747 (Tex. App.-Houston [14th Dist.] 2007, no pet.). 
A federal due-process violation occurs whenever the State suppresses or fails to disclose
material, exculpatory evidence, regardless of whether the State acted in bad faith. 
Vasquez, 230 S.W.3d at 747 (citing Illinois v. Fisher, 540 U.S. 544, 547-48 (2004))
(emphasis added).

 Here, the State did not fail to disclose or suppress the videotape. Swanson testified
that "There was no video as far as I know. I believe the videotape had expired. But if it
was, the video from that car was saved for, due to the state law of 90 days, the 90 days
has elapsed by now." Thus, this is a case involving a failure to preserve evidence. 

 The Supreme Court has held the State's duty to preserve evidence is limited to that
which might be expected to play a significant role in the suspect's defense. California v.
Trombetta, 467 U.S. 479, 488-89 (1984). To meet that standard, the exculpatory value of
the evidence must be apparent before its destruction, and the evidence must be of a
nature that the defendant would be unable to obtain comparable evidence by other means.
 Id. The Supreme Court has held that if a defendant wants to prove a federal due-process
violation based on a state's destruction of potentially useful evidence, as opposed to
material, exculpatory evidence, the defendant must show the state acted in bad faith in
destroying the evidence. Vasquez, 230 S.W.3d at 747 (citing Fisher, 540 U.S. at 547-48;
Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988)). The Youngblood Court described
potentially useful evidence as "'evidentiary material of which no more can be said than that
it could have been subjected to tests, the results of which might have exonerated the
defendant.'" Id. (quoting Youngblood, 488 U.S. at 57-58).

 At the dismissal hearing, Swanson testified that "I would have liked to keep this
tape. This would have helped me tremendously in this case. So if there was a tape there,
I would have saved it." From this testimony, it is hard to imagine how the missing
videotape might be expected to play a significant role in Martinez's defense. See
Trombetta, 467 U.S. at 488-89. Accordingly, the tape did not have exculpatory value
apparent to the State before it was reused. 

 Concerning the State's destruction of potentially useful evidence, there is no
evidence showing that law enforcement destroyed the tape in a calculated effort to
circumvent the disclosure requirements of Brady v. Maryland. Rather, the evidence
showed that if there was a tape, it was reused pursuant to police-departmental procedure
and in compliance with state law. (12) The trial court did not make an explicit finding of bad
faith, nor can a finding of bad faith be implied because there is no evidence in the record
to support that finding. There being neither an explicit finding of bad faith nor evidence to
support an implicit finding of bad faith, no federal due-process violation is shown. See
Youngblood, 488 U.S. at 57-58; Trombetta, 467 U.S. at 488-89 

Due Course of Law Clause


 To adjudicate this appeal, we must decide whether the Due Course of Law Clause
provides a greater level of protection than the Due Process Clause regarding the State's
destruction of potentially useful evidence. The Due Course of Law Clause provides, in
relevant part, that "[n]o citizen of this State shall be deprived of life, liberty, property,
privileges or immunities, or in any manner disfranchised, except by the due course of the
law of the land." Tex. Const. art. I, § 19. The Due Process Clause provides: "No State
shall make or enforce any law which shall abridge the privileges or immunities of citizens
of the United States; nor shall any State deprive any person of life, liberty, or property,
without due process of law . . . ." U.S. Const. amend. XIV, § 1.

 The Texas Constitution uses the words "due course of the law of the land" instead
of "due process of law," and the Due Process Clause does not specifically mention
disfranchisement. See id. Otherwise, the wording of the two provisions is substantially
similar. Disfranchisement means "'the act of taking away the right to vote in public
elections from a citizen or class of citizens.'" Vasquez, 230 S.W.3d at 749 (quoting
Black's Law Dictionary 480 (7th ed.1999)). Presuming, without deciding, that
disfranchisement is not one of the privileges or immunities covered by the Due Process
Clause, that would mean only that the Due Course of Law Clause applies to more types
of deprivations than does the Due Process Clause. Id. at 750. Because this case involves
a deprivation of Martinez's liberty, this potential difference in the two provisions is not
relevant. The State's deprivation of Martinez's liberty triggers the requirement of due
course of law and due process of law. Id. Therefore, the only words from the two
constitutions that relate to the scope of the protections provided are "due course of the law
of the land" and "due process of law." Id.

 In Rodriguez v. State, 21 S.W.3d 562, 568 (Tex. App.-Houston [14th Dist.] 2000,
pet. ref'd), the court held that the Due Course of Law Clause generally does not provide
any greater protection than the Due Process Clause. (13) Vasquez, 230 S.W.3d at 750-51. 
Other than the Waco Court of Appeals's decision in Pena v. State, 226 S.W.3d 634, 651
(Tex. App.-Waco 2007, pet. granted), no Texas appellate court contradicts the precedents
mentioned in footnote 13.

 Without adopting the holding in Pena, we will apply the court's analysis due to the
possibility the Court of Criminal Appeals may decide to adopt the Pena decision. The
Pena Court held that "under the Due Course of Law provision of article 1, section 19, the
State has a duty to preserve material evidence which has apparent exculpatory value,
encompassing both exculpatory evidence and evidence that is potentially useful to the
defense." Id. at 651. The Pena Court adopted the following approach as the standard for
a due course of law claim:

 the following three factors should be weighed to decide whether a
defendant's state constitutional due process rights have been violated by the
State's failure to preserve potentially exculpatory evidence:


 (1) would the evidence have been subject to discovery or disclosure;


 (2) if so, did the state have a duty to preserve the evidence; and


 
(3) if there was a duty to preserve, was that duty breached, and what
consequences should flow from the breach.


Id. at 651 (citing Deberry v. State, 457 A.2d 744, 750 (Del. 1983)). With respect to the third
factor, the Pena court stated:

 [W]e draw a balance between the nature of the State's conduct and the
degree of prejudice to the accused. The State must justify the conduct of the
police or prosecutor, and the defendant must show how his defense was
impaired by loss of the evidence. In general terms, the court should consider
"(1) the degree of negligence or bad faith involved, (2) the importance of the
lost evidence, and (3) the sufficiency of the other evidence adduced at the
trial to sustain the conviction."


Id. (quoting Deberry, 457 A.2d at 752) (citations omitted).

 Regarding the first two Pena factors, Swanson's testimony did not show that a tape
was made. Rather, he believed the tape ran out. He also testified that if a tape was made,
it would have been reused after ninety days. If we assume a tape was made, its contents
were potentially useful to the defense because Martinez testified that the tape would have
shown that he did not consent to the search. Based upon this assumption, then, the State
had a duty to preserve the tape, and it was subject to disclosure.

 Next, we turn to the third Pena factor and what consequences should flow from the
State's failure to preserve the tape.

The Degree of Negligence or Bad Faith Involved

 From Swanson's testimony, it appears that (1) if the tape existed, it was reused after
ninety days in compliance with state law and (2) that there is no evidence of any bad faith
on the part of the police or the prosecutor. Furthermore, there is no evidence of any
intentional misconduct relating to the missing tape. We find that the first element weighs
against a due course of law violation.
The Importance of the Lost Evidence

 The significance of the missing tape is disputed--Swanson testified that the tape
would have helped his case, while Martinez argues it would have shown he did not consent
to search. Assuming we believe Martinez, the missing tape is potentially significant, but
its significance is lessened because Martinez testified at the suppression hearing that he
told Swanson to "do whatever you want to do." Furthermore, Martinez's testimony is
subject to impeachment due to his prior felony conviction. See Tex. R. Evid. 609. We find
that the second element weighs neither in favor of nor against a due course of law
violation.

The Sufficiency of the Other Evidence to Sustain the Conviction


 The missing tape was not critical to whether the State could establish Martinez's
guilt beyond a reasonable doubt. Swanson testified that Martinez gave him consent to
search. He found the cocaine in the console of the car, which Martinez was driving. 
Accordingly, this element weighs against a due course of law violation.

 Even assuming the State was either mistaken or negligent in reusing the tape after
ninety days, we find little, if any, impairment to the defense. Accordingly, we hold that the
failure to preserve the tape did not violate Martinez's due course of law rights. Issues four
and five are overruled.




 The trial court's judgment is affirmed.



 ROSE VELA

 Justice


Do not publish. 

Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and 

filed this 24th day of January, 2008.
1. On October 16, 2006, the trial judge signed a document titled "TRIAL COURT'S CERTIFICATION
OF DEFENDANT'S RIGHT OF APPEAL" and placed an "X" corresponding to the preprinted statement: "is
in a plea-bargain case, but matters were raised by written motion filed and ruled on before trial and not
withdrawn or waived, and the defendant has the right of appeal." 
2. Swanson did not find a weapon during the search of Martinez's vehicle.
3. The passenger did not testify at the suppression hearing.
4. Martinez testified the third field-sobriety test was "The walk twenty paces in a line."
5. Article 38.23 provides, in relevant part:

 

 (a) No evidence obtained by an officer or other person in violation of any provisions of the
Constitution or laws of the State of Texas, or of the Constitution or laws of the United States
of America, shall be admitted in evidence against the accused on the trial of any criminal
case.


Tex. Code Crim. Proc. Ann. art. 38.23(a) (Vernon 2005).
6. In other words, if a driver is stopped on suspicion of DWI, once the officer determines the driver is
not impaired, the officer should promptly release the driver. Kothe v. State, 152 S.W.3d 54, 63 (Tex. Crim.
App. 2005).
7. The Sharpe Court explained:


 While it is clear that "the brevity of the invasion of the individual's Fourth Amendment
interests is an important factor in determining whether the seizure is so minimally intrusive
as to be justifiable on reasonable suspicion," we have emphasized the need to consider the
law enforcement purposes to be served by the stop as well as the time reasonably needed
to effectuate those purposes.


470 U.S. at 685, (citation omitted).
8. We note that the Texas Constitution follows the federal standard for an investigatory detention as
set out in Terry. See Rhodes v. State, 945 S.W.2d 115, 117 (Tex. Crim. App. 1997).
9. Martinez filed a pretrial motion to dismiss due to loss or destruction of potentially useful and/or
exculpatory evidence.
10. 373 U.S. 83 (1963).
11. 473 U.S. 667 (1985).
12. In 2001, Texas passed legislation prohibiting racial profiling by peace officers, codifying law-enforcement policy on racial profiling, and requiring reports by peace officers for traffic and pedestrian stops. 
See Tex. Code Crim. Proc. Ann. arts. 2.131-.134 (Vernon Supp. 2006). Article 2.135 provides an exemption
from the reporting requirements of articles 2.133 and 2.134 for law-enforcement agencies using video and
audio equipment. See Tex. Code Crim. Proc. Ann. art. 2.135. In relevant part, subsection (b) of article 2.135
provides:

 [A] law enforcement agency . . . shall retain the video and audio or audio documentation of
each traffic and pedestrian stop for at least 90 days after the date of the stop. If a complaint
is filed with the law enforcement agency alleging that a peace officer employed by the agency
has engaged in racial profiling with respect to a traffic or pedestrian stop, the agency shall
retain the video and audio or audio record of the stop until final disposition of the complaint.


Tex. Code Crim. Proc. Ann. art. 2.135(b) (Vernon Supp. 2006) (emphasis added). There is no evidence
showing that a racial-profiling complaint was filed which would have operated to extend the required ninety-day
retention period. Thus, the record reflects compliance with the statutory retention requirements of article
2.135(b).
13. The Texas Supreme Court also has stated that the language of these two clauses is "nearly
identical" and that there is no meaningful distinction between "due course" and "due process." See Univ. of
Texas Med. Sch. at Houston v. Than, 901 S.W.2d 926, 929 (Tex. 1995). In addition, eight other Texas courts
of appeals have held that the Due Course of Law Clause does not provide a greater level of protection than
the Due Process Clause regarding the State's loss or destruction of evidence in a criminal prosecution. See
Alvarado v. State, No. 07-06-0086-CR, 2006 WL 2860973, at *3 (Tex. App.-Amarillo Oct. 9, 2006, no pet.)
(not designated for publication) (holding that Due Process Clause and Due Course of Law Clause provide the
same protection concerning the State's destruction of potentially useful evidence); McGee v. State, 210
S.W.3d 702, 705 (Tex. App.-Eastland 2006, no pet.) (same); Salazar v. State, 185 S.W.3d 90, 92 (Tex.
App.-San Antonio 2005, no pet.) (same); Jackson v. State, 50 S.W.3d 579, 588-89 (Tex. App.-Fort Worth
2001, pet. ref'd) (holding that both Due Course of Law Clause and Due Process Clause require showing of
bad faith by state in failing to preserve potentially useful evidence); Williams v. State, 946 S.W.2d 886, 893
& n.4 (Tex. App.-Waco 1997, no pet.) (concluding that state's loss of videotape showing defendant's
performance of sobriety tests did not violate Due Process Clause or Due Course of Law Clause because there
was no evidence of bad faith by state); Mahaffey v. State, 937 S.W.2d 51, 53 (Tex. App.-Houston [1st Dist.]
1996, no pet.) (holding that the State's erasing of videotape of sobriety tests did not violate Due Process
Clause or Due Course of Law Clause because there was no evidence of bad faith by the State); State v. Rudd,
871 S.W.2d 530, 532-33 (Tex. App.-Dallas 1994, no pet.) (holding that Due Process Clause and Due Course
of Law Clause provide the same protection regarding state's destruction of potentially useful evidence);
Saldana v. State, 783 S.W.2d 22, 23 (Tex. App.-Austin 1990, no pet.) (same as Jackson).