GOVERNMENT OF THE VIRGIN ISLANDS

v.

PAUL TESTAMARK, Appellant

No. 77-1567

United States Court of Appeals

Third Circuit

Argued December 7, 1977

Filed January 10, 1978

GEORGE M. ALEXIS, ESQ., Federal Public Defender, St. Thomas, V.I., *for appellant*

THOMAS K. MOORE, ESQ., Assistant U.S. Attorney (Office of the U.S. Attorney), St. Thomas, V.I., *for appellee*

Before ADAMS, ROSENN and HUNTER, *Circuit Judges*

OPINION OF THE COURT

ADAMS, *Circuit Judge*

This case, in which Paul Testamark was charged with assaulting Merry Cook with intent to rape, raises the issue of how a court should deal with a police department's failure to preserve evidence that is potentially critical in a criminal proceeding.

At the trial, which took place before a jury, Ms. Cook testified to the following version of the event. Testamark

had been drinking early in the day on July 9, 1976, at the self-service bar of the gift shop where Ms. Cook worked. He had then left to go swimming. Upon his return, two and half hours later, Testamark made himself another drink, and chatted with Ms. Cook about farming. He then unexpectedly grabbed her from behind, covered her mouth and dragged her outside.

Ms. Cook related that when Testamark threw her to the ground, he lost his hold on her mouth, and she then cried for help. Testamark, at that point, told her to "be cool" and "she would like it." When he proceeded to pull her dress up, Ms. Cook screamed again. Testamark then covered her mouth, and told Ms. Cook that he would let her breathe if she would turn over and be quiet. He began to pull her dress up again, and informed her if she screamed once more he would choke her to death. Ms. Cook shouted yet a third time, and Testamark began to carry out his threat.

At that point, the encounter was interrupted by one Carl Strauch, who arrived in response to the screams. Testamark left hurriedly, saying, according to Strauch, something about having been cheated.

Both Strauch and Ms. Cook identified Testamark in court as the assailant. In addition, Ms. Cook's husband testified that shortly after the assault, he confronted Testamark, and that when Mr. Cook stated "you're the one", and grabbed him, Testamark replied "no, it was someone else", and fled.

Testamark testified in his own defense, and provided a somewhat different account. Some time after leaving the gift shop where Ms. Cook worked, he recounted, he began to feel "strange" and "saw my mind going through optical changes." Deciding that his previous drink was the source of his discomfort, Testamark returned to the gift shop to confront Ms. Cook. When Ms. Cook turned to walk away without answering, he grabbed her, believing her to

472

be responsible. They struggled and fell to the ground, with Ms. Cook on top. Testamark declared that at that point "sex was the furthest thing from my mind." When Strauch arrived, Testamark maintained he simply left, and passed out shortly thereafter.

A policeman testified that he found Testamark on the afternoon of July 9, 1976, apparently asleep, in the bushes that were nearby the gift shop where Ms. Cook worked. The officer stated that Testamark appeared normal, but that the defendant smelled of alcohol and, upon questioning, falsely identified himself as "Davey Crakker."

After placing Testamark under arrest, the police took him to a hospital to draw a blood sample. By that time it was after 5:00 p.m. on Friday afternoon, and the police chemist, who analyzed such samples, was no longer in his office. Consequently, one of the officers, Harry Daniels, took custody of the sample. Daniels neglected, however, to refrigerate it, and upon delivering it to the chemist on the following Monday, the sample was unusable.

Although at the trial, Testamark admitted the assault, he defended on the theory that he was so bemused by the intoxicant he had imbibed that he was unable to form a specific intent to rape. He argued that either he was drunk or that the liquor he had taken contained drugs. The jury rejected Testamark's defense and he was found guilty as charged. The court sentenced him to 10 years in prison.

Testamark's first contention on appeal, and the most troubling one, is that by allowing the blood sample to spoil, the Government of the Virgin Islands has denied him due process of law. It is clear that had the blood sample been preserved, Testamark could have successfully requested that it be disclosed.[1] And, had the government suppressed the blood sample, or denied access to a copy

---

[1] See Federal Rule of Criminal Procedure 16(a)(1)(C) and 16(a)(1)(D); United States v. Agurs, 427 U.S. 97 (1976).

of the report of the sample's analysis after a defense request, Testamark's constitutional rights might well have been violated if the blood sample could be characterized as "material".[2] By allowing the blood sample to spoil, Testamark urges, the government has in effect suppressed evidence which could have conclusively established his defense of incapacity.[3] The government has thus immunized itself, Testamark argues, to subsequent defense requests by destroying potentially exculpatory evidence.

In support of his claim, Testamark points a) to the fact that Officer Daniels testified that he knew that the blood would spoil if not refrigerated and b) to indications that the failure to refrigerate was a violation of standard police procedure. Moreover, Testamark notes that the trial judge commented that he thought that "the police deliberately did not preserve the integrity of that blood."

The government responds, first, that the failure to refrigerate the blood, while regrettable, was at worst negligent misconduct, not deliberate suppression of evidence, and second that the negligence was outweighed on a "pragmatic balancing standard" by the evidence of guilt adduced at trial.[4]

 While this case is one of first impression in our Circuit, it is well settled elsewhere that the failure of the police or prosecutor to preserve evidence may, in some circumstances, constitute grounds for reversal of a conviction. In United States v. Augenblick, 393 U.S. 348 (1968), in the context of a Jencks Act request at a court martial for tapes of the defendant's interrogation, the

---

[2] See United States v. Agurs, 427 U.S. 97; Giglio v. United States, 405 U.S. 150 (1972); Brady v. Maryland, 373 U.S. 83 (1963); United States v. McCrane, 547 F.2d 204 (1976 3d Cir.).

[3] Cf. United States v. Butler, 499 F.2d 1006 (D.C. Cir. 1974) (loss of urine sample may be due process violation where defendant raised argument that he was too drunk to form specific intent).

[4] See United States v. Bryant, 448 F.2d 1182 (D.C. Cir. 1971) (FBI agents destroyed tape-recording which may have contained a conversation of defendant in contravention of FBI regulation).

Court noted that "the Navy bore the burden of producing them or explaining why it could not do so."[5] Since, however, the Navy had apparently acted in good faith, but was simply unable to find the tapes after "earnest efforts", the conviction was upheld.

■ The Court of Appeals for the District of Columbia, in a leading case on loss of evidence, interpreted Augenblick as holding that where evidence has been lost or destroyed by the government, convictions may be permitted to stand only "so long as the Government has made 'earnest efforts' to preserve crucial materials and to find them once a discovery request is made" United States v. Bryant, 439 F.2d 642 (1971).[6] Other circuits have followed Bryant in holding that the government's failure to take adequate steps to preserve evidence may deny a defendant due process, and thereby jeopardize otherwise viable convictions.[7]

---

[5] 393 U.S. at 355–56.

[6] However, in that case, after examination of the "pragmatic balance" between the negligence of the FBI agents in destroying potentially relevant tapes and the unintelligibility of the tapes combined with the evidence of guilt, the D.C. Court of Appeals determined that the conviction should be affirmed, 448 F.2d 1182, 1184 (D.C. Cir. 1971) (after remand). See generally e.g. United States v. Quiover, 539 F.2d 744 (D.C. Cir. 1976) (refusing to dismiss indictment where no testimony as to contents of tapes negligently destroyed); United States v. Harrison, 524 F.2d 421 (D.C. Cir. 1975) (FBI practice of destroying interview notes disapproved); United States v. Butler, 499 F.2d 1006 (D.C. Cir. 1974) (remand for testimony on events surrounding urine test allegedly lost by jail authorities which might have borne on defense of incapacity).

[7] See e.g. United States v. Loud Hawk (9th Cir. Nos. 76-1906 and 76-2127 July 1977) slip op. (dismissing indictment because of "good faith" but "deliberate" destruction of evidence); United States v. Harris, 543 F.2d 1247 (9th Cir. 1976) (FBI practice of destroying rough notes of interviews is improper); United States v. Higginbotham, 539 F.2d 17 (9th Cir. 1976) (destruction of photo array used in identification, but mere negligence involved by state officials could not be imputed to federal officials); Armstrong v. Collier, 536 F.2d 72 (5th Cir. 1976) (duty to preserve is applicable but insufficient prejudice proven to warrant reversal); United States v. Miranda, 526 F.2d 1319 (2d Cir. 1975); United States v. Augelo, 451 F.2d 1167 (2d Cir. 1971) (duty to preserve tapes exists, but where no indication of bad faith or negligence, the destruction of the tapes did not call for sanctions); United States v. Pollock, 417 F.Supp. 1332 (D. Mass. 1976) (Tauro, J.) (dismissing indictment because of government destruction of notes); Note, The Right to Independent Testing: A New Hitch in the Preservation of Evidence Doctrine, 75 Colum. L. Rev. 1355 (1975); Comment, Judicial Response to Governmental Loss or Destruction of Evi-

■■ We fully endorse these views. Loss or destruction of relevant evidence by the government not only raises general questions of the fundamental fairness of a criminal trial, but may also deny a defendant the right to compulsory process. The right to subpoena evidence at trial, and the obligation of the prosecutor to disclose exculpatory evidence are inherent in the conception of a criminal trial as a truth-seeking process. These rights and obligations may be undermined if the prosecution has no duty to preserve the evidence which it later must disclose.

In this case, Officer Daniel's actions were in violation of departmental procedures, and indeed may be characterized as gross negligence. By no means are they the "earnest efforts" contemplated by Augenblick and Bryant. As such, they could raise doubts about the validity of a conviction.

Having established that a serious violation has taken place, however, we must now consider what sanctions are appropriate.

■ Testamark is correct that had the blood sample been suppressed at trial and later recovered, he might well have been entitled to a new trial if the sample had proved exculpatory. Under United States v. Agurs, when the suppressed evidence has been requested by defense counsel, the defendant is entitled to be retried where the evidence "might have affected the outcome of the trial."[8] If the blood sample showed a high level of inebriation, it is possible that such suppression of evidence would have been sufficiently material to warrant a new trial.

This conclusion, however, only begins our inquiry, for this case differs from Agurs in two respects. First, the

---

dence, 39 U. Chi. L. Rev. 542 (1972); cf. Killian v. United States, 368 U.S. 231 (1961) (good faith destruction of FBI interim notes would not require new trial, but, bad faith destruction would warrant new trial absent harmless error).

[8] 427 U.S. 97, 104 (1976).

relief available under Agurs, a new trial where the defense might use the suppressed evidence, is not possible here.[9] A new trial here would be infected by the same taint as the former hearing. We are therefore faced with a choice between dismissing the charges entirely and affirming the conviction.[10]

 Second, because the evidence has been lost, it is impossible to determine directly its probable effect on the jury, which under Agurs would constitute the decisive factor. Our "over-riding concern with the justice of the finding of guilt"[11] must therefore focus on the evidence presented at trial in the attempt to determine whether this error may be properly characterized as harmless.[12]

The sole issue upon which the blood sample could have been relevant was whether Testamark was sufficiently competent to form an intent to rape. On this point, the evidence presented at trial weighed heavily against the defendant's contentions. The only drink that Testamark testified to having taken was imbibed two and a half hours before his assault on Ms. Cook. According to Ms. Cook, Testamark, upon his return to the gift shop, seemed rational. He was able to carry on a coherent conversation, and he moved steadily. During the assault, Testamark acted with apparent purpose in attempting to keep Ms.

---

[9] United States v. Bryant, 439 F.2d 642, 653 (D.C. Cir. 1971).

[10] In another case, less drastic sanctions might be available. Thus, if the evidence destroyed simply represented a possibility of impeaching a discrete piece of government evidence, the exclusion of that evidence might be appropriate. See People v. Hitch, 113 Cal. Rptr. 158, 520 P.2d 974, vacated and revd. upon rehearing, 12 Cal. 3d 641, 117 Cal. Rptr. 9, 527 P.2d 361 (1974) (excluding evidence of "breathalyzer" test in drunken driving case where test ampoule was lost by state police). Or prejudice might be cured by a "missing witness" instruction. See United States v. Quiover, 539 F.2d 744 (D.C. Cir. 1976) (noting that instruction might have been appropriate, but defendant did not request such instruction). See generally Comment, Judicial Response, supra note 7, at 563–65.

[11] United States v. Agurs, 427 U.S. at 112.

[12] We need not decide whether, had this error come before the trial court on a motion to suppress evidence at the opening of the trial, the harmless error doctrine would have been applicable. Cf. United States v. Loud Hawk, supra.

477

Cook quiet, and informing her that she would "like it" if she kept still. When he was captured, the police testified, Testamark appeared normal, although groggy, and gave and spelled a false name. This testimony does not describe the actions of a man who is non compos mentis. Nonetheless, had these items been the sole pieces of evidence concerning Testamark's mental condition, it might have been that a blood alcohol test showing inebriation could have swayed the jury's verdict. From the government's evidence, the jury could only infer Testamark's competent mental condition. And, in the absence of direct evidence, a blood alcohol reading might have supported a contrary inference.

In this case, however, Testamark's own testimony at trial rebutted the contention that he was incompetent to form an intent at the time of the assault. When Testamark first noticed his mind going through "optical changes", according to his own testimony, he was sufficiently purposeful to decide to make his way back to the gift shop, and to put his plan into effect by convincing some fellow bathers to give him a ride. Testamark's description of his encounter with Ms. Cook is not punctuated by self-proclaimed incoherence or amnesia. Although Testamark's account differed from that of Ms. Cook, the variations in no way reflect a lack of competence or an absence of awareness of his actions. Sex, he stated, was "the furthest thing from his mind", but there is no testimony or, indeed evidence of any sort that his mind was not fully functioning. It was only *after* the assault and subsequent departure from the gift shop that Testamark claims to have "blacked out".

■ We are thus confronted with a defendant whose own description of his actions unwaveringly points to his competence at the time of the act in question. In view of this direct testimony, even had the jury been confronted

with a high blood alcohol reading, it could not reasonably have retained a suspicion that the alcohol had rendered Testamark incapable of forming an intent to rape. Thus, even if the blood test contained all that the defendant suggests that it might, there is no reasonable possibility that the preservation of the blood sample would have affected the outcome of this case. We therefore conclude that the failure to preserve the blood samples was harmless beyond a reasonable doubt.[13]

■ This conclusion should be narrowly circumscribed. In the case before us, the police officer who failed to preserve the evidence did not know, and indeed could have had no knowledge of its contents. Accordingly, we cannot infer from the improper action that the evidence would have been exculpatory.[14] Nor are we faced with a continuing course of errant conduct which might call for prophylactic sanctions.[15] There is sworn testimony that this was the first instance of blood being drawn by the police on St. John's Island, and, there is no indication that neglect in dealing with blood samples or other failure to preserve evidence is a frequent occurrence. We assume that the Virgin Islands police will in the future take precautions to prevent episodes similar to this one, and adopt policies to guard against loss of evidence in other areas. Should this court be faced with comparable police

---

[13] See e.g. United States ex rel. Dorey v. New Jersey, 560 F.2d 584 (3d Cir. 1977); Killian v. United States, supra. 368 U.S. at 243–244.

[14] See Comment, Judicial Response, supra note 7 at 563 n.122 (bad faith destruction of evidence implies materiality because government agent may be assumed to have destroyed evidence he regards as helpful to the defense); cf. United States v. Pollock, 417 F.Supp. 1332, 1346 (D. Mass. 1976) (Destruction of interim notes combined with transcription from those notes 10 months later and back-dating of transcription implies bad faith which warrants dismissal of indictment.).

[15] Cf. United States v. Harrison, 524 F.2d 421 (D.C. Cir. 1976) (disapproving FBI policy of destroying interim notes). The government's apparent ongoing practice of deporting illegal immigrant workers before the trial of individuals charged with immigration offenses regarding those workers may account for the Ninth Circuit's rule dismissing prosecutions in such cases. United States v. Tsutagawa, 500 F.2d 420 (9th Cir. 1974); United States v. Mendez-Rodriguez, 450 F.2d 1 (9th Cir. 1971).

conduct in the future, another result might well be called for.

■ Testamark's other contentions do not warrant reversal. We have carefully examined Testamark's objections to the jury charge. The objection entered in the record at trial apparently referred to the Court's instruction that the jury could infer consciousness of guilt from a fabricated response upon being confronted concerning a crime. We find no error in the instructions which the court gave.[16]

Counsel for the defendant also questions the juxtaposition of the "consciousness of guilt" instruction and the instruction that once impeached on one issue, a witness may be disbelieved on all other issues. The defendant maintains that such instructions invited the jury to infer from the impeachment of Testamark on one issue the affirmative elements of guilt on other issues.

■ Since the defense failed to make this objection "distinctly" at trial, as required by F.R. Crim. P. 30, the objection cannot now be used to reverse the conviction, absent plain error. And while it might have been better practice to separate the two instructions referred to, the failure to do so was not plain error. Accordingly, the conviction will be affirmed.

---

[16] See e.g. Govt. of the Virgin Islands v. Lowell, 6 V.I. 422, 378 F.2d 799, 806, 807 (3d Cir. 1967); United States v. Di Stefano, 555 F.2d 1094 (2d Cir. 1977); United States v. Bear Killer, 534 F.2d 1253 (8th Cir. 1976).