From a conviction for the offense of cruelty to animals, in violation of § 13A-11-14, Code of Alabama (1975), this appeal follows. For the reasons outlined below, the conviction is due to be affirmed.
After a trial by jury, the appellant was found guilty of the offense of "cruelty to animals," an offense which is statutorily defined as follows:
 "(a) A person commits the crime of cruelty to animals if, except as otherwise authorized by law, he intentionally or recklessly:
(1) subjects any animal to cruel mistreatment; or
 (2) subjects any animal in his custody to cruel neglect; or
 (3) kills or injures without good cause any animal belonging to another." Section 13A-11-14, Code of Alabama 1975.
Evidence presented by the State tended to show that the animals were in "real bad shape" and suffered from various afflictions, including mange, blindness, dehydration, parasites, infections, pneumonia, and distemper. Based on the veterinarian's examination and recommendation, the animals were humanely destroyed. Appellant raises two issues. The first issue deals with the destruction of the animals and the second issue raises the question of the sufficiency of the proof of the State's case.
The State presented evidence of the condition of the animals at the time of the search and seizure. At trial, Bill Carter, Animal Cruelty Investigator, Jefferson County Sheriff's Department, testified that on June 27, 1983, he went to the appellant's house. Carter inspected the premises, pursuant to a search warrant, and made the following observations concerning the condition of the appellant's dogs:
 "A. They were in real bad shape, mange. Two of them were actually blind, couldn't see where they were going.
"Q. What did they do when they got out in the yard? *Page 14 
 "A. They couldn't run at all, they had been penned up so long. You could outrun them. They only run a short distance and fall over. No stamina. We could catch them with no problem. . . .
". . .
 "Q. And you say some of them, in your opinion, were blind?
 "A. Two of them appeared to be blind. . . . They would run into the side of the house, hit the fence, — the fence is real close to the house, back like 10 feet. They would hit the fence and house. They just couldn't see where they were going.
". . .
 "Q. Would you describe the condition of the dogs at that time, as far as their skin and fur, and anything that you can tell the jury about?
 "A. Well, just in real bad shape. Dehydrated. You're familiar with dogs when you pick them up by the skin, and the skin will stay up momentarily and then sink back down. That is a sign of dehydration.
 On the vet's examination, they had parasites, pneumonia, temperature. And she recommended euthanizing the dogs, and they were euthanized.
". . .
 "Q. Would you describe to the court and ladies and gentlemen, the conditions you observed under the [house]?
 "A. I had to get on my knees. It's about this high. I shined my light down. The odor was so bad, urine, feces, and just a terrible odor. I had to go straight home and take a bath. Fleas literally covered my clothing.
"Q. Was it damp or dry?
"A. Very damp at that time.
"Q. Did you observe any food up under the house?
"A. No, sir."
Carter also testified that ten of the dogs were removed on that day and taken to the Bessemer Humane Society. The animals were kept at the Bessemer Humane Society until the Birmingham Humane Society veterinarian had an opportunity to examine them. Based on her recommendation, all ten animals were humanely destroyed.
On behalf of the State, Stephanie Phillips, Veterinarian, Birmingham Humane Society, testified that on June 29, 1983, she examined the ten dogs in question and made the following diagnosis and recommendation for treatment:
 "A. Well, I concluded that they were suffering from internal and external parasites, which included fleas, lice. There was some indication of deposits of fly eggs on them. Some of them had various degrees of mange, which is caused by a parasite called a mite that invades the skin.
 Some of them had elevated temperatures, temperatures being over 102.5, which is the upper level for canine species. They also had clinical signs of pneumonia and distemper.
 Without more thorough clinical tests, [this was] evident by a discharge from their nose, or runny thick yellowish discharge from the nose and their eyes. The pneumonia, which is also manifested in distemper. Also, a lot of them had — I believe one of them was eliciting [sic] some form of what we call neurological symptoms, which is a ticking of one of the paws.
 "Q. What, if anything, was your diagnosis with regard to any prognosis for the future of these animals?
 "A. Well, they were in pretty poor condition. They were underweight, dehydrated. And that was determined by what we call a skin roll test, [where] the skin is lifted off the muscular, and the weight settles back on the body, to determine whether or not he is dehydrated or poorly kept and dehydrated. They were not in a clean environment. My prognosis was bad for them.
 "Q. In your study of these animals, what did you decide to do with them?
 "A. I recommended to the shelter keeper they be euthanized."
Additionally, one of the appellant's neighbors testified that the appellant's yard, house, and under the house was "full *Page 15 
of dogs." According to this witness, some of the dogs "didn't have any hair" and some could "hardly walk." The witness also stated that the dogs created problems for the neighborhood, including noise, odor, and fleas.
For the defense, both the appellant and his wife testified that the animals were provided with a warm place to stay; they were watered twice a day and fed both dry dogfood and chicken bones which had been "cooked in a pressure cooker." The appellant testified that the animals were "strays" and that he had a "practice of taking in dogs off the street." The appellant stated that he dusted both the animals and the area under the house with pesticide for the fleas. The appellant denied that any of the dogs had distemper. He also stated that the dogs did not have fleas and were in "absolutely" good health. According to the appellant, while Carter was at the house with the search warrant, he "never mentioned the fleas or tried to get the fleas off."
 I
Appellant argues that the State's destruction of the animals denied him the opportunity to have an independent medical examination. This "willful destruction," according to the appellant, violated his right to inspect the evidence to be used against him. In his brief, the appellant relies primarily on cases which involve the preservation and examination of evidence in controlled substance cases.
Unlike the proof problems associated with controlled substance, or "drug" cases, however, the facts of this case raise entirely different issues. In order to present sufficient evidence of the offense, the State was required to establish the mistreated or neglected condition of the dogs at the timeof the search and seizure. The evidence presented by the State's witnesses tended to show that the animals were in an abused, diseased, and neglected condition at the time they were taken into protective custody. Other than the appellant's mere denial of the allegations, no evidence was presented to refute the charges made by the State. Additionally, the animals were destroyed in response to the prescribed medical treatment recommended for the dogs, due to their hopeless condition. Thus, not only did the State present a prima facie case, but, additionally, there was no evidence that the destruction of the animals was either improper action on the part of the State or prejudicial to the appellant as a result.
Although there would not appear to be any Alabama cases directly on point, the recent Florida case of Adams v. State,367 So.2d 635 (Fla.App.), cert. denied, 376 So.2d 68 (Fla. 1979), is analogous. In Adams, the Florida court upheld a conviction for the possession of dynamite, even though, for safety reasons, the police officers had destroyed the dynamite. In that case, the dynamite had deteriorated to the point that "sweat beads" had formed on the surface of the sticks, indicating that the explosives were highly dangerous and unstable. Since the proper "render-safe technique" was detonation, the dynamite was destroyed. After noting that the appellant's due process argument was "most troublesome," the court in Adams stated as follows:
 "Whenever the state is unable to produce physical evidence which has been in the possession of the state, a serious constitutional issue is presented. It is clear, however, that the state's failure to produce such evidence does not call for an automatic reversal of a conviction. State v. Sobel, 363 So.2d 324 (Fla. 1978). The supreme court in the Sobel case approved a balancing approach suggested by United States v. Bryant, 145 U.S.App.D.C. 259, 448 F.2d 1182 (1971) and its progeny. Under that approach, where evidence is lost or destroyed while in the possession of the state, the impact of the omission must be evaluated in the context of the entire record. A court must examine the circumstances of the loss or destruction to determine whether there has been a violation of the duty of the state to preserve evidence, a duty which clearly arises during the investigatory phase of a case. Whether there had *Page 16 
been such a violation, and whether it was flagrant or in total disregard of the rights of the accused, is the first line of inquiry.
 "But the analysis does not end there. In a case where the destruction of the evidence was a flagrant and deliberate act done in bad faith with the intention of prejudicing the defense, that alone would be sufficient to vitiate a conviction. But where the circumstances amount to less than this, a conviction should not be overturned unless it can be concluded from a review of the record that the defendant's case was in fact prejudiced by the omission of the nonpreserved evidence. Government of the Virgin Islands v. Testamark, 570 F.2d 1162 (3d Cir. 1978)." 367 So.2d 640.
After considering the above factors, the court in Adams
concluded that the destruction of the dynamite was done for safety reasons and thus was in "good faith." Since there was no showing of prejudice to the appellant as a result, the conviction was upheld.
Following the Adams analysis, the facts of this case show that the humane destruction of the dogs was in response to the prescribed medical treatment and, thus, there was no "bad faith" on the part of the State. Additionally, there is no indication that the appellant was prejudiced as a result. The appellant had the opportunity to cross-examine the State's witnesses who testified concerning the condition of the dogs. The appellant chose not to present rebuttal evidence, by way of health care professionals or others who had observed the condition of the animals. As the Florida courts have noted, the "mere possibility that nonpreserved evidence might have helped the defendant is not sufficient showing of prejudice." Strahornv. State, 436 So.2d 447, 449 (Fla.App. 1983). Additionally, it is significant to note that, although the animals were destroyed on June 29, 1983, there was no request to examine the animals or "produce" the evidence prior to trial on March 22, 1984, some nine months later.[1] Thus, appellant has failed to establish that the destruction of the evidence was not done in "good faith" and, additionally, has not shown that he was prejudiced as a result.
 II
The second issue raised on appeal is the appellant's argument that the State failed to carry its burden of proof and establish the elements of the offense. According to the appellant, evidence presented by the State merely proved that the animals were suffering from fleas and disease. Appellant argues that this evidence does not establish "mistreatment or neglect," as required by the statute. Even though the State's case was based on circumstantial evidence, this evidence, as outlined above, proved all of the elements of the offense of cruelty to animals as defined by § 13A-11-14, Code of Alabama
(1975). Here, as in Anderton v. State, 390 So.2d 1083
(Ala.Cr.App.), cert. denied, 390 So.2d 1087, (Ala. 1980), the trier of fact had sufficient evidence, albeit circumstantial, to reasonably conclude that the appellant was guilty of the crime as charged. Any conflict in the evidence was properly decided by the jury adversely to the appellant.
AFFIRMED.
All the Judges concur.
[1] Although appellant also argues that his due process rights under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215 (1963), were violated, he concedes in his brief that there was no request for the production of the animals prior to trial. Since there was no request for disclosure, there is no basis for a claim that the evidence was "suppressed" by the prosecution. *Page 318