NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2633
_____

DAVID MUNCHINSKI

v.

GERALD SOLOMON, in his official capacity as District Attorney
of Fayette County, Pennsylvania and in his individual capacity;
RALPH WARMAN, in his official capacities as First Assistant
District Attorney and District Attorney of Fayette County, Pennsylvania
and in his individual capacity; JOHN A. KOPAS, III, in his official capacity
as First Assistant District Attorney of Fayette County and in his individual
capacity; DANA L. FAYOCK, Executrix of the Estate of George Fayock

Gerald Solomon; Ralph Warman,
Appellants
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 2-13-cv-01280
District Judge: Honorable David S. Cercone

Argued Pursuant to Third Circuit L.A.R. 34.1(a)
May 2, 2018

Before: SMITH, *Chief Judge*, HARDIMAN, and RESTREPO, *Circuit Judges*

(Filed: August 28, 2018)

Lee R. Demosky
Thomas P. Pellis                  **[ARGUED]**
Meyer Darragh Buckler Bebenek & Eck
40 North Pennsylvania Avenue
Suite 410
Greensburg, PA  15601
        *Counsel for Appellants*

Noah Geary                        **[ARGUED]**
Suite 225
Washington Trust Building
Washington, PA  15301
        *Counsel for Appellee*

_____

OPINION*

_____


SMITH, *Chief Judge.*

## I.    Introduction[1]

David Munchinski was released from prison in 2011 pursuant to a petition for federal habeas corpus relief. His release took place twenty-seven years after his conviction for the murders of two men in 1977, James P. Alford and Raymond

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] We write primarily for the parties, and describe the facts only as necessary for our holding. A background of the prosecution and many of the relevant facts can be found in the opinion affirming the grant of Munchinski's habeas petition. *Munchinski v. Wilson*, 694 F.3d 308 (3d Cir. 2012).

Gierke, which came to be known as the "Bear Rocks Murders." After his conviction was vacated, Munchinski filed suit under 42 U.S.C. § 1983 against, among others, two of the Fayette County prosecutors who tried his case: Gerald Solomon and Ralph Warman. Munchinski alleged violations of his rights under the Sixth and Fourteenth Amendments, accusing the prosecutors of failing to preserve exculpatory evidence, evidence tampering, and withholding exculpatory evidence in violation of judicial orders. Solomon and Warman filed motions for summary judgment, arguing that they were entitled to absolute prosecutorial immunity from suit, or, in the alternative, that they were entitled to qualified immunity for their conduct. Munchinski also filed a motion for summary judgment on the question of whether the prosecutors violated *Brady v. Maryland*, 373 U.S. 83 (1963).

The District Court held that the prosecutors were not entitled to absolute or qualified immunity from suit, and granted Munchinski's motion for summary judgment on the question of *Brady* violations. The District Court left as a jury question whether a causal link existed between the *Brady* violations and Munchinski's conviction. Solomon and Warman now bring this interlocutory appeal to challenge the District Court's denial of absolute and qualified immunity. We will affirm in part, reverse in part, vacate in part, and remand for further proceedings.

## II.  Jurisdiction and Standard of Review

We have jurisdiction over this appeal from a collateral order under 28 U.S.C. § 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). We review only the collateral order denying immunity to the prosecutors; the District Court's other orders must await a final judgment in this case before they are ripe for review. At this stage, we do not review the District Court's factual findings or its determination that a genuine issue of material fact exists. *Johnson v. Jones*, 515 U.S. 304, 317 (1995). Instead, we review de novo the District Court's legal conclusions. Even then, we review only those legal conclusions that are "abstract"—such as whether a given law was clearly established—rather than "fact-based"—such as the question of whether, as a matter of law, there remains a genuine issue of material fact for trial. *Id.*

## III.  Absolute Immunity

In order to protect prosecutorial independence and discretion, a prosecutor is entitled to absolute immunity from suit for actions taken in his role as an advocate for the state. *Odd v. Malone*, 538 F.3d 202, 207–08 (3d Cir. 2008). But while that immunity is absolute within its scope, it is not all-encompassing. A prosecutor is not absolutely immune from suit based on investigative or administrative actions, or for actions that otherwise fall entirely outside his role as an advocate. *Id.* at 208, 211.

Because absolute immunity attaches not to the prosecutor as an individual, but to the nature of the function pursuant to which he acts, we evaluate each action that

4

forms the basis of the suit. We determine, as a matter of law, whether they took place as part of the prosecutor's role as an advocate for the state, or were more properly considered investigative, administrative, or otherwise not an exercise of the prosecutorial role.

Munchinski accuses the prosecutors in this case of violating his rights in four ways: by knowingly failing to preserve a tape of an interview conducted with Richard Bowen, a key prosecution witness; by tampering with a Pennsylvania State Police report ("the Goodwin report") describing that same interview; by withholding exculpatory evidence from him in 1983 despite a judicial order to the contrary; and by withholding exculpatory evidence from him in 1992 in violation of a different judicial order entered as part of his post-conviction proceedings in Pennsylvania state court. We conclude that the knowing failure to preserve the Bowen tape and the withholding of exculpatory evidence in 1992 are *not* acts entitled to absolute immunity, but that the acts of modifying the Goodwin report and withholding exculpatory evidence in 1983 *are* entitled to absolute immunity.

### a. Knowing Failure to Preserve the Bowen Tape

In 1979, Solomon and Warman, along with Pennsylvania State Police Trooper Montgomery Goodwin and others, interviewed Bowen about the Bear Rocks murders. Munchinski alleges, with some support, that the interview was taped and that the prosecutors knowingly failed to preserve that tape; Solomon and Warman

assert that the interview was never taped. The content of the meeting is also disputed; unsurprisingly, the prosecutors assert that Bowen's statements were "entirely inculpatory," App. at 232, while Munchinski argues that the statements were exculpatory and contradicted Bowen's later testimony. The District Court determined that there was a genuine dispute of material fact as to whether the tape ever existed, and declined to grant the prosecutors' motions for summary judgment. Our standard of review does not permit us to resolve the dispute of material fact over the tape's existence. Accordingly, the prosecutors are not entitled to absolute immunity on the basis that a tape was never made. What remains for us to determine is whether, assuming a tape did at some point exist, the prosecutors would be absolutely immune from suit for their knowing failure to preserve it.

A prosecutor's knowing failure to preserve exculpatory evidence is not entitled to absolute immunity because it is not part of the prosecutorial function. *Henderson v. Fisher*, 631 F.2d 1115, 1120 (3d Cir. 1980) (per curiam). In *Henderson*, state prosecutors were alleged to have knowingly allowed a police officer to remove exculpatory evidence from a police evidence locker—evidence which subsequently vanished. *Id.* at 1117. We declined to afford absolute immunity to the prosecutors, declaring that while "[t]he handling of evidence is clearly within the sweep of 'initiating and presenting the State's case,'" "it is difficult to characterize a prosecutor's knowing failure to stop the removal of exculpatory

6

material" the same way. *Id.* at 1120 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 431 n.33 (1976)). It follows that, consistent with *Henderson*, the knowing failure to preserve exculpatory evidence, much like the knowing destruction of exculpatory evidence, is not part of the prosecutorial function and therefore not entitled to absolute immunity. *See Yarris v. County of Delaware*, 465 F.3d 129, 136–37 (3d Cir. 2006) ("[D]estroying exculpatory evidence is not related to a prosecutor's prosecutorial function."). Solomon and Warman are not entitled to absolute immunity for their knowing failure to preserve the exculpatory Bowen tape.[2]

### b. Modifying the Goodwin Report

The same 1979 meeting that was the subject of the alleged Bowen tape was memorialized in a report prepared by Goodwin. Munchinski alleges that the original version of the Goodwin report was withheld. The Goodwin report originally stated that Bowen met with Solomon, Warman, Goodwin, and others, and that "[a] statement was furnished and taped which will be transcribed by the D.A. office." App. at 33, 264. In responding to Munchinski's pretrial discovery requests before

---

[2] The District Court based its ruling on a different ground—that the meeting between Solomon, Warman, Goodwin, and Bowen served an investigative function rather than a prosecutorial one. *See also Munchinski v. Solomon*, 618 F. App'x 150, 154 & n.5 (3d Cir. 2015) (denying the prosecutors' motion to dismiss Munchinski's complaint on absolute immunity grounds for the same reason). Because we conclude that the knowing failure to preserve exculpatory evidence under these circumstances is not part of the prosecutorial function, we need not decide whether the interview with Bowen was investigatory or prosecutorial in nature.

his criminal trials, however, Warman tampered with the report by removing the paragraph discussing the meeting and its recording. Warman "pasted together the surrounding paragraphs in such a manner as to conceal" the removal, hiding the existence of the meeting from Munchinski. App. at 33.

The District Court, citing *Odd v. Malone*, 538 F.3d 202, 211 (3d Cir. 2008), concluded that Warman's conduct in tampering with the Goodwin report was so "egregious" that it fell outside the protection of the doctrine of absolute immunity. App. at 27. In *Odd*, we noted that some acts, "presumably by virtue of their egregiousness . . . fall wholly outside the prosecutorial role no matter when or where they are committed." 538 F.3d at 211. Warman's admitted tampering with an item of discovery, ostensibly to reflect his recollection that the September 9, 1982 Bowen interview was not recorded, would be precisely this type of act. Warman's modification of the Goodwin report during pretrial discovery to remove information about whether the Bowen interview had been recorded was tantamount to the destruction of exculpatory evidence, which, like the knowing failure to preserve evidence, falls outside the prosecutorial function. *See Odd*, 538 F.3d at 211; *Yarris*, 465 F.3d at 136–37. As such, Warman is not entitled to absolute immunity under these facts.

### c. Withholding Exculpatory Evidence in Violation of Judicial Orders

Munchinski's first trial ended with a hung jury and mistrial in 1983. Later that year, in response to Munchinski's "Petition to View Evidence," the Honorable Richard D. Cicchetti of the Fayette County Court of Common Pleas "ordered and directed" that:

> counsel for the defendants, and the defendant, David Joseph Munchinski[,] be permitted to examine, inspect, photograph and make record notes of all evidence that the Office of the District Attorney and/or the Pennsylvania State Police or their agents, may have in their possession or that they may acquire, that relates to the above captioned cases.

App. at 8. Munchinski alleges that certain exculpatory evidence was nevertheless withheld, in direct violation of Judge Cicchetti's order.

Munchinski was retried and convicted in 1986. In 1992, he initiated post-conviction relief proceedings pursuant to the Post Conviction Relief Act (PCRA), 42 Pa. Cons. Stat. §§ 9541–51. Munchinski's first of three rounds of PCRA proceedings ("PCRA I") was before the Honorable William J. Franks, also of the Fayette County Court of Common Pleas. In the course of this proceeding, Warman testified that he had altered the Goodwin report during pretrial discovery. In response to Warman's admission, Judge Franks ordered the Commonwealth to "produce all Pennsylvania State Police investigation files related to the murders of Alford and Gierke, as well as three additional files on Bowen," for in camera review. App. at

12. Munchinski alleges that certain exculpatory evidence was withheld in violation of Judge Franks' order.

We note that without the two judicial orders, Solomon and Warman would clearly be entitled to absolute immunity from suit for withholding exculpatory evidence. *See Imbler*, 424 U.S. at 431 n.34. Absolute immunity exists primarily to protect the discretion of prosecutors when they act as advocates for the state. Making pretrial discovery decisions is part and parcel of that advocative function, and frequently involves the exercise of discretion. As such, the prosecutor is entitled to absolute immunity from suit—even when he intentionally withholds evidence that is exculpatory under *Brady*. *See id.* We extend absolute immunity to such acts because "accurately determining guilt or innocence requires that both the prosecution and the defense have wide discretion in the conduct of the trial and the presentation of evidence." *Id.* at 426. To do otherwise would risk "hamper[ing] [prosecutors] in exercising their judgment," *id.*, and "would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." *Id.* at 427–28.

The question before us is whether a prosecutor loses the protection of absolute immunity when, in addition to withholding exculpatory evidence in violation of *Brady*, he violates a judicial order. The more discretion a judicial order eliminates from the prosecutor's role, the more likely it is that a violation of that order strips

the prosecutor of absolute immunity. Consequently, on these facts, we hold that Solomon and Warman are entitled to absolute immunity for their decision to withhold evidence in violation of Judge Cicchetti's order, but Warman is not so entitled for his decision to withhold evidence in violation of Judge Franks' order.

As the Supreme Court discussed in *Imbler*, there is a tension between "leav[ing] unredressed the wrongs done by dishonest officers" and "subject[ing] those who try to do their duty to the constant dread of retaliation." 424 U.S. at 428 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)). When the prosecutorial function involves the exercise of discretion, as it often does, the balance between redressing wrongs and preserving the freedom to exercise independent judgment weighs in favor of the prosecution. *See id.* at 422–23 ("The common-law immunity of a prosecutor is based upon . . . considerations that . . . . include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust."). When, however, an order by its terms severely circumscribes the prosecutor's discretion, that balance changes. Such an order—perhaps one enumerating specific documents that the prosecutor must turn over to the defendant—does not leave room for the prosecutor, fearing future liability, to "shade his decisions," *id.* at 423; there is no decision left for him to make. The prosecutor's

11

duty in the face of such an order (short of challenging the order by appropriate means) is not to advocate, but simply to comply; it is ministerial or administrative rather than advocative. *See Munchinski*, 618 F. App'x at 155–56 ("Insofar as the PCRA court's order did not require Warman to exercise any discretion to determine if an item was covered by the order, the order did not require the exercise of a prosecutorial function."); *see also Odd*, 538 F.3d at 214 ("We can imagine few circumstances under which we would consider the act of disobeying a court order or directive to be advocative, and we are loath to grant a prosecutor absolute immunity for such disobedience."); *cf. Reid v. New Hampshire*, 56 F.3d 332, 337 (1st Cir. 1995) (holding that an order requiring the police to turn over "exculpatory" evidence left discretion to the prosecutors).

### i. Judge Cicchetti's 1983 Order

Judge Cicchetti's order arguably removed discretion from the prosecutors— as far as it went. The text of the order required that Munchinski "be permitted to examine, inspect, photograph and make record notes of all evidence that the Office of the District Attorney and/or the Pennsylvania State Police or their agents, may have in their possession or that they may acquire, that relates to" the case. App. at 8. While this order, on the surface, seems quite broad, our interpretation of its scope is informed by the "Petition to View Evidence" that prompted it. App. at 315–16; *see Reid*, 56 F.3d at 337 (consulting the motion that prompted a disclosure order to help

12

determine the order's scope). That petition described Munchinski's theretofore unsuccessful efforts to "examine all physical evidence that is in the possession of the Pennsylvania State Police and also the Office of the District Attorney." App. at 315. Munchinski testified that when he went to see the evidence pursuant to the order, the police showed him physical evidence, and when asked whether he was shown any documentary evidence, he testified that the police told him all such evidence was "work product." App. at 396. Munchinski apparently did not challenge that refusal by police at the time. This bolsters our conclusion that Judge Cicchetti's order arguably removed all discretion as to the physical evidence in the possession of the police and prosecution team, but did not address the documentary evidence. Here, the evidence Munchinski alleges was withheld is documentary, and thus outside the scope of the request and the court's order granting the motion. Solomon and Warman retained their ordinary prosecutorial discretion with respect to work product and documentary evidence, and as a result, they are entitled to absolute immunity.

### ii. Judge Franks' 1992 Order

We conclude that Judge Franks' order removed all discretion from the prosecution.[3] The order required the prosecution to give the court "[t]he entire

---

[3] Warman and Solomon argue that they were no longer personally involved in Munchinski's prosecution at the time of the PCRA I proceeding. Munchinski's

Pennsylvania State Police investigation file" in Munchinski's case and in three cases related to Bowen, along with the Bowen tape recording. App. at 359–60. The order left no room for debate about whether particular evidence was exculpatory, relevant, or otherwise privileged. Warman's duty was not advocative or discretionary; it was a judicially mandated task that was ministerial or administrative. As Judge Franks acknowledged, the order was grounded in Warman's earlier abuse of discretion in tampering with the Goodwin report. *See* App. at 358. The purpose of the order was to *remove* Warman's discretion and place it in the hands of the court. We conclude that Judge Franks' order clearly removed all discretion from the prosecutor's role. As a result, Warman is not entitled to absolute immunity for his failure to turn over the entire State Police file.

## IV.    Qualified Immunity

Solomon and Warman also argue that they are entitled to qualified immunity for their actions. The District Court did not explicitly conduct a qualified immunity analysis in response to the summary judgment motions, but reiterated its denial of qualified immunity in response to earlier motions to dismiss brought by the

complaint does not assert that Solomon was involved with the PCRA I proceeding, as he was by then a judge on the Court of Common Pleas of Fayette County. At a minimum, the question of Warman's personal involvement is a factual dispute beyond the scope of our interlocutory review. We assume for purposes of this opinion that Warman was involved.

prosecutors.[4] Because we determine that the prosecutors are entitled to absolute immunity in connection with withholding exculpatory evidence in violation of Judge Cicchetti's order, we consider their arguments in support of qualified immunity only with respect to the knowing failure to preserve the Bowen tape, modifying the Goodwin report, and Warman's withholding evidence in violation of Judge Franks' order. We conclude that the prosecutors are not entitled to qualified immunity for their knowing failure to preserve the Bowen tape or modifying the Goodwin report. As for the decision to withhold evidence, we conclude that Warman is not entitled to qualified immunity for at least the three pieces of evidence Judge Franks testified he was not provided. As for the eight remaining pieces of evidence, the District Court must determine on remand whether a genuine issue of material fact exists as to whether the evidence was provided to Judge Franks, and if so, whether Munchinski knew or should have known of the essential facts permitting him to take advantage of the exculpatory evidence.

---

[4] The sum total of the District Court's qualified immunity analysis at the motion to dismiss stage is as follows: "Finally, the Court finds that neither Solomon, Warman[,] nor Fayock are entitled to qualified immunity as Plaintiff's rights under the Sixth Amendment and *Brady v. Maryland* are well established at the time of their alleged misconduct." App. at 102–03. In the District Court's opinion denying the prosecutors' motions for summary judgment, it held: "This Court, however, has already ruled that the Prosecutors are not protected by qualified immunity in this matter." App. at 26. Suffice it to say that we must expand on the District Court's analysis.

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (alterations in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second prong "asks whether the right in question was 'clearly established' at the time of the violation. Governmental actors are 'shielded from liability for civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."'" *Id.* at 1866 (citations omitted). We look first to Supreme Court precedent, and "[i]f none exists, we consider whether there is a case of controlling authority in our jurisdiction or a '"robust consensus of cases of persuasive authority" in the Courts of Appeals [that] could clearly establish a right for purposes of qualified immunity.'" *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017) (alteration in original) (citations omitted).

Because this is an interlocutory appeal, we continue to accept the District Court's determinations as to whether or not the record shows a genuine issue of material fact on any particular point.

### a. Knowing Failure to Preserve the Bowen Tape and Modifying the Goodwin Report

At the relevant time, defendants had a clearly established due process right protecting them from a prosecutor's knowing failure to preserve exculpatory evidence. *See Gov't of Virgin Islands v. Testamark*, 570 F.2d 1162, 1165–66 (3d Cir. 1978) ("[T]he . . . failure to take adequate steps to preserve evidence may deny a defendant due process, and thereby jeopardize otherwise viable convictions."); *see also Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see Killian v. United States*, 368 U.S. 231, 242 (1961). A reasonable prosecutor would not have believed it was appropriate to knowingly fail to preserve exculpatory evidence or to tamper with it, as Munchinski alleges occurred in this case. The District Court held that the existence of the Bowen tape and the facts surrounding its destruction were genuine issues of material fact for trial, a conclusion not subject to our review at this interlocutory stage. Having determined that a clearly established right existed, we easily conclude that neither Solomon nor Warman is entitled to qualified immunity for their alleged knowing failure to preserve the Bowen tape or modifying the Goodwin report.

### b. Withholding Exculpatory Evidence in 1992

Our analysis of whether Warman is entitled to qualified immunity for the decision to withhold exculpatory evidence in 1992 differs from our absolute immunity analysis. Here, Judge Franks' order alone is not enough to establish that

17

Warman had a duty to turn over exculpatory evidence. Instead, in light of the facts as found by the District Court, we must look to the state of the law that was clearly established in 1992.

In 1991, this Court issued an opinion in *United States v. Perdomo*, 929 F.2d 967 (3d Cir. 1991), that laid out the then-current scope of a prosecutor's obligations under *Brady v. Maryland*. As we explained, "[a] valid *Brady* complaint contains three elements: (1) the prosecution must suppress or withhold evidence, (2) which is favorable, and (3) material to the defense." *Perdomo*, 929 F.2d at 970 (citing *Moore v. Illinois*, 408 U.S. 786 (1972)). We held that the first element, suppression or withholding, would be satisfied if the prosecution failed to turn over evidence that was in the possession of some arm of the state, including police investigative files, *id.* at 970–71, a principle articulated by the Supreme Court shortly thereafter in *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Our decision in *Perdomo*, then, clearly established that a defendant had a right to exculpatory evidence in the hands of the police, not just evidence physically possessed by the prosecutors.

But at the time, the prosecution team's disclosure requirements did not extend to evidence that the defendant, with due diligence, should have discovered on his own. Specifically, "[e]vidence [was] not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *Perdomo*, 929 F.2d at 973 (citing

18

*United States v. Torres*, 719 F.2d 549 (2d Cir. 1983)); *see also United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984). *But cf. Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 290–93 (3d Cir. 2016) (en banc) (acknowledging confusion in our case law regarding the existence of a "due diligence" requirement for defendants and overturning that aspect of *Perdomo* and *Starusko*).

In sum, Warman violated clearly established law if he suppressed or withheld favorable and material evidence in possession of police or prosecutors, but only if Munchinski, in the exercise of diligence, could not have discovered that evidence himself. *See Perdomo*, 929 F.2d at 970. We must now determine the application of that clearly established law to the facts as found by the District Court to determine whether, as a matter of law, Warman is entitled to qualified immunity.[5]

As an initial matter, the parties appear to agree that either the police or the prosecutors possessed all the relevant evidence prior to the PCRA I hearing in 1992. We consider two questions for each piece of evidence to determine whether it was suppressed or withheld. First, was the evidence given to Judge Franks in 1992? Second, if it was not given to Judge Franks, did Munchinski know, or should he have known, of the essential facts permitting him to take advantage of the exculpatory

---

[5] The District Court granted summary judgment to Munchinski on the question of whether the prosecutors violated *Brady*. Although we may not review that judgment today, the District Court's factual determinations are relevant to our qualified immunity analysis.

evidence? If the answer to both questions is "no," and the evidence was suppressed or withheld, we assess its favorability and materiality.

On the record before us, we are able to answer the question of whether the evidence was given to Judge Franks in 1992 for only three of the pieces of evidence Munchinski alleges were withheld: the Bates report, the Goodwin/Powell report, and the Mangiacarne/Carbone report. The District Court cited Judge Franks' testimony, given during the PCRA III proceeding, that those three reports were withheld from his in camera review, and that if he had been aware of them, he may well have granted relief to Munchinski during the PCRA I proceeding.

Munchinski alleges that in addition to these three documents, Warman withheld eight other pieces of evidence: the Powell addendum, the addendum to Alford's autopsy report, the Kinch report, Bowen's parole revocation documents, the Dunkard/Proud report, the Veil/Mangello report, the Madden/Lucy report, and the marked Bates report. It is not clear from the District Court's findings whether those items were withheld from Munchinski before his trial and retrial, or from Judge Franks during the PCRA I proceeding. On remand, the District Court must determine whether this evidence was withheld from Judge Franks in 1992 (as opposed to being withheld in violation of Judge Cicchetti's 1983 order) and whether Munchinski was or should have been aware of the essential facts that would have permitted him to take advantage of the evidence.

As for the three pieces of evidence that were clearly withheld from Judge Franks, we must determine whether Munchinski knew or should have known about their existence at the time of the PCRA I proceeding, and if not, whether the evidence was favorable and material to his defense.

1. The Bates report

The Bates report was prepared by State Police Trooper George F. Bates, dated January 6, 1978. App. at 34. It described an interview with Maria Caccia, who indicated that Bowen was in Oklahoma at the time of the murders rather than in Pennsylvania. *Id.* Munchinski, aware by 1982 that Bowen may have been in Oklahoma and that Bates' files might contain exculpatory evidence, sought a discovery order allowing access to the files. *Id.* That discovery request was denied. Nevertheless, as the District Court noted in the context of analyzing the *Brady* issues, there is no evidence that Munchinski knew the contents of Bates' files or of the existence of the Caccia interview when he filed the discovery request, and there is no evidence that he knew or should have known of that information before the PCRA I proceeding. To the extent Munchinski was required to exercise due diligence to acquire that information, we note that his denied discovery request sought to do exactly that. Consequently, we conclude that this evidence was withheld within the meaning of the first prong of our *Brady* analysis. Nor do we have any difficulty

21

concluding that it was favorable evidence for Munchinski, given that it tended to show that the prosecution's key witness could not have witnessed the crime.

2. The Goodwin/Powell report

The Goodwin/Powell report was prepared by Goodwin and dated December 20, 1977. *Id.* The report described an interview with the deputy coroner, Jack Powell, who stated that he believed one of the murder victims had anal intercourse more than twenty-four hours before he was murdered, which contradicts Bowen's testimony to the effect that he had witnessed Munchinski raping the victim immediately before the murder. Warman does not argue that Munchinski was aware of this report, nor did the District Court so find. Again, we conclude that this evidence was withheld within the meaning of the first prong of our *Brady* analysis. So too, the report was favorable to Munchinski, as it contradicted Bowen's testimony.

3. The Mangiacarne/Carbone report

The Mangiacarne/Carbone report was prepared by State Police Corporal Mangiacarne and dated December 16, 1980. App. at 35. The report detailed an interview with Elizabeth Carbone, who stated that Mike Urdzik told her he witnessed Ed Wiltrout murder Alford and Gierke in 1977 over a drug deal. *Id.* She told Mangiacarne that Urdzik was her drug dealer, and that he had told her about the murders two weeks after they occurred. *Id.*

22

Warman argues that Munchinski was given evidence showing that Wiltrout and Urdzik were suspects in the murders, and that the Mangiacarne/Carbone report was therefore redundant. The District Court, citing *Monroe v. Angelone*, 323 F.3d 286, 301 (4th Cir. 2003), held that the "obligation to disclose *Brady* materials . . . applies even to evidence that appears redundant. 'Redundancy may be factored into the materiality analysis, but it does not excuse disclosure obligations.'" App. at 36. Although the District Court did not explicitly make a finding of fact to this end, there is record evidence to support Warman's point that Munchinski was aware that Wiltrout and Urdzik were suspects in the murder before the PCRA I hearing. *See* App. at 299–301, 312–13, 318–19.

Under *Perdomo*, we believe that redundancy could be relevant both to whether the defendant had reason to be aware of the exculpatory evidence, and the question of materiality. Here, neither Warman nor the District Court has pointed to record evidence that Munchinski had reason to know of Carbone's statement to Mangiacarne (rather than the more general fact of the existence of other suspects), and so we have no hesitation in concluding that the evidence was suppressed or withheld. So too, evidence that someone else committed the murders is clearly favorable to Munchinski.

Warman's strongest argument is that the Carbone statement was immaterial because of its redundancy, but as we note below, our consideration of materiality takes into account all the withheld evidence, not any individual item standing alone.

\* \* \*

Taking all the favorable evidence that was suppressed or withheld as whole, we consider whether it was material. In light of the District Court's findings and Judge Franks' testimony that he may have ruled differently had the evidence not been withheld, we readily conclude that the three pieces of evidence, considered together, were material to the PCRA I proceeding. That Munchinski knew Wiltrout and Urdzik were suspects does not significantly change our analysis. Therefore, we hold that Warman is not entitled to qualified immunity as to his involvement in withholding, at a minimum, the three withheld reports. We will remand the case for the District Court to consider in the first instance the application of qualified immunity to the remaining eight pieces of evidence Warman allegedly withheld.

## V. Conclusion

We will affirm the District Court's judgment insofar as it denied absolute immunity to the prosecutors for their conduct in knowingly failing to preserve the Bowen tape, modifying the Goodwin report, and withholding exculpatory evidence in 1992. We will reverse the District Court's judgment insofar as it denied absolute immunity to the prosecutors for withholding evidence in violation of Judge

24

Cicchetti's 1983 order. We will affirm the District Court's denial of qualified immunity as to the knowing failure to preserve the Bowen tape, the modification of the Goodwin report, and the denial of qualified immunity for withholding three pieces of evidence from Judge Franks. We will vacate and remand the District Court's judgment as applied to the remaining eight pieces of evidence for the court to conduct a qualified immunity analysis. The case will be remanded for proceedings consistent with this opinion.